David P. EVANS, et al., Plaintiffs,

v.

J. Brian ATWOOD, et al., Defendants.

No. CIV.A. 96–2746(RMU).

United States District Court,
District of Columbia.

March 22, 1999.

---

Raymond Charles Fay, Laura C. Fentonmiller, Bell, Boyd & Lloyd, Washinton, DC, Saron L. Papp, American Foreign Service Ass'n, Washington, DC, Burton David Fretz, National Senior Citizens Law Center, Washington, DC, for Plaintiffs.

Rudolph Contreras, Mary Lou Leary, U.S. Atty's Office, Washington, DC, for Defendants.

### MEMORANDUM OPINION
**Dismissing the Plaintiffs' Disparate Impact Claim and Denying the Defendants' Motion for Summary Judgment.**

URBINA, District Judge.

## I. INTRODUCTION

This class action case arises under the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. §§ 621–634. The plaintiffs, a certified class of former Foreign Service employees, claim that Defendant United States Agency for International Development ("USAID") and J. Brian Atwood, the Administrator of the USAID, discriminated against them in favor of younger workers when the Agency conducted a reduction in force ("RIF") in 1993.

This case comes before the court on the defendants' motion to dismiss the plaintiffs' disparate impact claim, on the plaintiffs' motion for partial summary judgment as to liability on the disparate impact claim, and on the defendants' motion for summary judgment. The court concludes that the ADEA does not allow for suits brought on a disparate impact theory. Therefore, the court grants the defendants' motion to dismiss the plaintiffs' disparate impact claim and denies as moot the plaintiffs' motion for partial summary judgment. The court also concludes that a genuine issue of material fact exists as to whether the defendants discriminated against the plaintiffs on the basis of their age in the RIF. Accordingly, the court denies the defendants' motion for summary judgment.

## II. BACKGROUND

On September 27, 1996, the USAID terminated the employment of ninety-one employees as the culmination of a RIF effort. (2d Am. Compl. at ¶¶ 1, 14.) The plaintiffs, thirty-seven of the terminated employees, brought suit on behalf of themselves and others similarly situated against the USAID and its Administrator, J. Brian Atwood. In their class action suit the plaintiffs claimed that the USAID discriminated on the basis of age and did not accord its older workers equal treatment with younger workers. (2d Am. Compl. at ¶ 1.) The court certified the class of former Foreign Service employees who had obtained the age of forty years or older at the time of their selection for separation.

(Document No. 22; see 2d Am. Compl. ¶ 9.)

The plaintiffs claim discrimination under theories of both disparate impact and disparate treatment and request declaratory and injunctive relief, back pay, attorney fees, and costs. (2d Am Compl. at 14–15.) The defendants have moved to dismiss the disparate impact claim and for summary judgment on the disparate treatment claim. The plaintiffs have moved for partial summary judgment on the disparate impact claim.

## III. DISCUSSION

### A. The Disparate Impact Claim

The plaintiffs allege that the USAID selected employees from higher grade levels for reduction, thereby resulting in the termination of a vastly disproportionate number of older employees, while protecting entire groups of younger employees from the reduction. (2d Am.Compl.¶¶ 1, 15–16.) In this respect, 96 of the 97 Foreign Service employees originally selected for the RIF had reached 40 years of age. (2d Am.Compl.¶ 9.) The defendants assert that the ADEA does not permit suits brought under the theory of disparate impact. (Mem. in Supp. of Defs.' Mot. to Dismiss at 1.)

■ Before a court may decide the merits of a case, the court must first have jurisdiction to hear it. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991) (citing Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). The plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence. See Darden v. United States, 18 Cl.Ct. 855, 859 (1989); Kehr, 926 F.2d at 1409; Boudreau v. United States, 53 F.3d 81, 82 (5th Cir.1995), cert. denied, 516 U.S. 1071, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996).

■ In general terms, a disparate impact claim involves employment practices

that appear facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (citing *Teamsters v. United States,* 431 U.S. 324, 335–336, n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Disparate impact claims do not require proof of discriminatory motive. *See Hazen Paper,* 507 U.S. at 609, 113 S.Ct. 1701. Disparate treatment, by contrast, involves the allegation that the employer treated a person (or some people) less favorably than others, because of race, color, religion, or another protected characteristic. *See Hazen Paper,* 507 U.S. at 609, 113 S.Ct. 1701. The "most easily understood type of discrimination," disparate treatment, requires proof of discriminatory motive. *Hazen Paper,* 507 U.S. at 609, 113 S.Ct. 1701.

The Supreme Court first recognized the disparate impact theory in the Title VII case of *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Pamela S. Krop, *Age Discrimination and the Disparate Impact Doctrine,* 34 Stan. L.Rev. 837, 837 n. 5 (1982). The Supreme Court has not decided whether the disparate impact theory extends to ADEA claims. "[W]e have never decided whether a disparate impact theory of liability is available under the ADEA, and we need not do so here." *Hazen Paper,* 507 U.S. at 609, 113 S.Ct. 1701 (citations omitted). Additionally, the Court noted that good reasons exist for not recognizing such a claim.

> [N]othing in the Court's opinion should be read as incorporating in the ADEA context the so-called "disparate impact" theory of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. As the Court acknowledges, *ante* at 1706, we have not yet addressed the question of whether such a claim is cognizable under the ADEA, and there are substantial arguments that it is im-

proper to carry over disparate impact analysis from Title VII to the ADEA. *Hazen Paper,* 507 U.S. at 618, 113 S.Ct. 1701 (Kennedy, J., concurring).

In *Hazen Paper* the Court held that when an employer acts on the basis of a factor empirically correlated with age, such as pension status or seniority, the employer does not violate the ADEA. *See Hazen Paper,* 507 U.S. at 608–609, 113 S.Ct. 1701. The Court reasoned that once the employer based its decision on factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. *See Hazen Paper,* 507 U.S. at 611, 113 S.Ct. 1701. "Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Hazen Paper,* 507 U.S. at 611, 113 S.Ct. 1701.

The District of Columbia Circuit has twice looked at the issue of whether the disparate impact theory extends to ADEA claims, and in each case the circuit court has ultimately decided not to rule on the issue. In *Arnold v. United States Postal Serv.,* 863 F.2d 994, 995–96 (D.C.Cir.1988), *cert. denied,* 493 U.S. 846, 110 S.Ct. 140, 107 L.Ed.2d 99 (1989), the plaintiffs complained that a requirement that the most senior postal inspectors must transfer to chronically understaffed offices had a disparate impact on postal inspectors over the age of forty. The D.C. Circuit concluded that it need not rule on whether the disparate impact theory extends to the ADEA because the merits did not support a finding for the plaintiffs' disparate impact claim. *Id.* at 998. "We do not decide whether the [disparate impact] test is applicable to ADEA cases because we conclude that the [Post Office plan] does not have a disparate impact on postal inspectors who are forty years of age and older." Similarly, in *Koger v. Reno,* 98 F.3d 631, 639 n. 2 (D.C.Cir.1996), the D.C. Circuit affirmed the summary judgment dismissal of the plaintiffs' disparate impact claim,

noting that it need not decide whether disparate impact analysis applied to age discrimination claims because the evidence presented did not establish a prima facie case of disparate impact.

In *Hyman v. First Union Corp.*, 980 F.Supp. 38 (D.D.C.1997), the court ruled that a claim of liability based on a disparate impact theory is not cognizable under the ADEA. In reaching that conclusion, the court noted that while Congress codified the disparate impact theory of liability with respect to Title VII (after *Griggs*), Congress has not made any similar amendments recognizing disparate impact liability under the ADEA. *See id.* at 40 (referring to the Civil Rights Act of 1991, Pub.L. No. 102–166, §.3, 105 Stat. 1071 (1991)). The court also noted that after the Supreme Court's pronouncement in *Hazen Paper*, the more recent case law points toward not recognizing disparate impact claims under the ADEA. *See id.* at 41. "[E]very circuit which has addressed the issue on the merits has interpreted *Hazen Paper* as prohibiting disparate impact claims under the ADEA.'" *Id.* at 41 (quoting *Fobian v. Storage Technology Corp.*, 959 F.Supp. 742, 747 (E.D.Va.1997)). After carefully analyzing the text and legislative history of the ADEA, the *Hyman* court concluded that both the policies underlying the ADEA and the emerging case law strongly support not recognizing ADEA disparate impact claims. *See id.* at 41.

■ This court sees no reason to diverge from this logic. The text of the ADEA does not specifically provide for disparate impact claims, and (unlike Title VII) Congress has not sought to amend the statute to include such claims. This absence of a Congressional mandate suggests that Congress did not intend for the ADEA to permit disparate impact claims. Further, the only Supreme Court pronouncement on the issue, Justice Kennedy's concurrence in *Hazen Paper*, which Chief Justice Rehnquist and Justice Thomas joined, suggests that the disparate im-

pact theory does not extend to the ADEA. Moreover, the disparate impact theory would seemingly negate the rationale behind the holding of *Hazen Paper*. For these reasons, the court concludes that the ADEA does not allow for disparate impact claims. Accordingly, the court grants the defendants' motion to dismiss the plaintiffs' disparate impact claim.

The plaintiffs moved for partial summary judgment as to liability on the disparate impact claim. Because the court has dismissed the plaintiffs' disparate impact claim, the court denies as moot the plaintiffs' motion for partial summary judgment.

## B. The Disparate Treatment Claim

The plaintiffs allege that top management at the USAID, including Administrator Atwood, conducted the RIF with the motive to scale back the number of older Foreign Service employees and to bring in new, younger employees to eventually take their place. In this respect, the plaintiffs allege that the USAID's RIF actions constituted part of a pattern or practice of discrimination on the basis of age. (2d Am.Compl.¶ 18.) The defendants seek summary judgment alleging that the plaintiffs have not made out a prima facie case, as required by *McDonnell Douglas* and its progeny. (*See* Defs.' Mem. in Support of Mot. for Summ. J. at 45.)

### 1. The *McDonnell Douglas* Burden–Shifting Paradigm

■ In a case brought under the ADEA, the plaintiff has the ultimate burden of proving that age was a "determining factor" in the challenged employment decision. *See Krodel v. Young*, 748 F.2d 701, 706 (D.C.Cir.1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985); *see also Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342 (D.C.Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983) (stating that the plaintiff "at all times retains the burden of persuasion"). To determine

whether the plaintiff has met this burden, courts apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C.Cir.1998).

■ The plaintiffs argue that they need not follow the *McDonnell Douglas* framework because they have presented direct evidence demonstrating age discrimination. (Pls.' Opp'n to Defs.' Mot. for Summ. J. at 5) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).) *Trans World Airlines* holds that the *McDonnell Douglas* test does not apply when the defendant's conduct "is discriminatory on its face." 469 U.S. at 121, 105 S.Ct. 613. In the instant case the RIF formula took into account USAID organizational changes; the employees' knowledge, skills, and competencies; tenure; performance; and military preference. (*See* Defs.' Mot. for Summ. J. at pp. 15–18.) While some of these factors can have an empirical correlation with age, a termination based on factors other than age, such as seniority, does not violate the ADEA. *See Hazen Paper*, 507 U.S. at 608–609, 113 S.Ct. 1701. Therefore, because the court does not find the RIF decision discriminatory on its face, the court must apply the *McDonnell Douglas* burden-shifting test.

### 2. The Plaintiffs' Prima Facie Case

■ Under the *McDonnell Douglas* framework, the plaintiffs must first establish a prima facie case of prohibited discrimination. *See Aka*, 156 F.3d at 1288 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). In this respect, the plaintiffs create an inference of discrimination in the ADEA context by showing that they (1) belong to the protected age group (age 40 or over), (2) were qualified for their positions, (3) were terminated, and (4) were disadvantaged in favor of younger persons. *See Coburn*, 711 F.2d at 342; *see also Paquin v. Federal Nat'l Mortgage*

*Ass'n*, 119 F.3d 23, 27 (D.C.Cir.1997) (delineating the fourth element as were "replaced" by younger persons). The burden of making a prima facie showing is not onerous. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The defendants do not dispute that the plaintiffs have met their burden in establishing the first two elements. In this respect, the plaintiffs constitute a certified class of discharged Foreign Service employees who had reached the age of forty years at the time of their separation, and the USAID does not assert that they could not, nor were not, performing their jobs in a satisfactory manner. In fact, a summary of performance evaluations of thirty-six of the thirty-seven plaintiffs, as taken from their USAID Employee Evaluation Reports for 1990 through 1995, indicates that no plaintiff received an evaluation indicating the employee had failed to demonstrate potential to perform at a higher level. (*See* Pls.' Summ. J. Ex. 55.)

■ The defendants assert that the plaintiffs have not established a prima facie case, however, because the plaintiffs have not shown that they were disadvantaged in favor of younger employees. (Defs.' Mem. in Support of Mot. for Summ. J. at 46.) The court finds that the plaintiffs have submitted evidence from which a jury could reasonably find that the RIF disadvantaged the plaintiffs in favor of younger employees. First, 96 of the 97 persons initially selected for the RIF had reached the age of 40. Second, after the RIF younger employees remained at the USAID. Third, the USAID exempted International Development Interns from the RIF, and their average age at the time of the RIF was 36, (Pls.' Summ. J. Ex. 51, Table 2A), compared with the average age of 48 at the time of the RIF for all Foreign Service employees and 51 for all Senior Foreign Service employees, (Pls.' Summ. J. Ex. 37, Table 2). Fourth, the USAID did not permit bump-and-retreat rights in the RIF, (*See* Pls.' Summ. J. Ex. 19),

because such a system "devastates the ranks of more junior and diverse staff," (Pls.' Summ. J. Ex. 24, at 2).[1]

A court making a summary judgment determination must view the facts in a light most favorable to the nonmovant, giving the nonmovant the benefit of all reasonable inferences derived from the evidence in the record. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Viewing the facts that, (1) with one exception, the USAID RIF encompassed only employees over 40 years old; (2) the USAID exempted the entire class of International Development Interns, and (3) the USAID did not permit bump-and-retreat rights, the court finds that, for summary judgment purposes, the RIF disadvantaged the plaintiffs in favor of younger employees. Accordingly, the court concludes that the plaintiffs have met their burden of establishing a prima facie case of discrimination.

### C. The Defendants' Reason for the Challenged Employment Action

■ Under the *McDonnell Douglas* framework, once the plaintiffs have established a prima facie case, the burden of production shifts to the defendants to assert legitimate, nondiscriminatory reasons for the challenged employment decision. *See Aka,* 156 F.3d at 1288 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817); *accord Cuddy v. Carmen,* 762 F.2d 119, 122 (D.C.Cir.), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985). In producing nondiscriminatory reasons for its challenged action, the employer does not have an obligation to support these reasons with objective evidence suffi-

cient to satisfy the preponderance of the evidence standard. *See Aka,* 156 F.3d at 1289 (citing *Texas Dep't of Community Affairs,* 450 U.S. at 259–260, 253, 101 S.Ct. 1089). The employer need not satisfy the preponderance standard because the plaintiff at all times retains the ultimate burden of persuasion. *See id.*

■ The USAID has advanced legitimate, nondiscriminatory reasons for both having the RIF and for the USAID's methodology used in selecting employees to separate. The defendants assert that in 1995 the USAID learned that Congress planned to limit the funding appropriated for USAID Operating Expenses for fiscal years 1996 and 1997, (Defs.' Mot. for Summ. J. Ex. 11, at ¶ 8), and Congress in fact provided less for those fiscal years than the USAID had requested, (*id.* at ¶¶ 4–7). Because of the projected budget deficit, the Administrator determined that a RIF constituted the "last resort option" available to the USAID. (*See* Defs.' Mot. for Summ. J. Ex. 10, at ¶ 25.)

Regarding the selection process, the defendants submitted the affidavit of Maribeth Zankowski, a Senior Management Analyst for Workforce Planning, who had responsibility for developing RIF procedures.[2] (*See* Defs.' Mot. for Summ. J. Ex. 1.) In her affidavit Maribeth Zankowski stated that she developed her recommendation based on criteria passed along to her by Frank Almaguer (Deputy Assistant Administrator for Human Resources) and Richard Nygard (Director, Office of Budget). (Defs.' Mot. for Summ. J. Ex. 1, at ¶ 25.) They provided the following criteria: (1) the USAID needed to reduce the

---

1. The defendants argue that bumping and retreating would create world-wide displacement and that the cascading effect might cost more in relocation costs (and language training) than the RIF would save. (Defs.' Mot. for Summ. J. at 19.) Because the court has the function at summary judgment of determining whether the evidence warrants a trial, and not of weighing evidence, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the court

will not make a credibility determination on this assertion.

2. The plaintiffs moved to strike this evidence on the ground that it reads more like a legal brief than factual statements. (Defs.' Mot. to Strike at 2.) The court rules that Maribeth Zankowski's declaration comports with the requirements of the Federal Rules. *See* Fed. R.Civ.P. 56(e). Accordingly, the court denies the plaintiffs' motion to strike.

number of direct hire employees by a minimum of 320; (2) 120 would come from attrition, and the other 200 would come from the RIF; and (3) of the 200, 97 would be Foreign Service officers, and 103 would be Civil Service employees. (Defs.' Mot. for Summ. J. Ex. 1, at ¶ 25.)

Based on Maribeth Zankowski's recommendation, the defendants assert that the USAID ultimately derived a model for the RIF that took into account the following: (1) organizational changes, including shortages of funds and realignment of mission; (2) primary skill codes, based on employee knowledge, skills, and competencies; (3) tenure of employment; (4) employee performance; and (5) military preference. (*See* Defs.' Mot. for Summ. J. at pp. 15–18.)

Furthermore, the defendants assert that they had several other incentives for conducting the RIF as they did. The defendants claim that the USAID had a concentration of employees at higher classes of the Foreign Service. (Defs.' Mot. for Summ. J. at 10.) Specifically, a 1994 report by the consulting firm Booz–Allen Hamilton concluded that the position and individual grade level distributions of the Foreign Service Officer corps were higher than the distribution resulting from a job analysis of their duties. (Defs.' Mot. for Summ. J. Ex. 3, at p. 1.) Thus, USAID Foreign Services Employees most commonly performed work at a level equivalent to FS–3 or below, whereas most employees had the higher grade of FS–1. (*See* Defs.' Mot. for Summ. J. Ex. 3.) Additionally, an August 1995 USAID report, titled "Human Resources: Business Area Analysis," noted the perception that overseas Foreign Service positions had inflated grade levels. (*See id.* at p. 12.) Further, the defendants point to the Clinton Administration effort to "right-size" the government. (Defs.' Mot. for Summ. J. at 20.)

The court concludes that these proffered bases satisfy the defendants' burden of articulating legitimate, nondiscriminatory reasons for the challenged employment ac-

tion. Because the defendants have met their burden, the presumption of discrimination raised by the prima facie case is rebutted and drops from the case. *See Aka,* 156 F.3d at 1289 (citing *Texas Dep't of Community Affairs,* 450 U.S. at 255 & n. 10, 101 S.Ct. 1089). Accordingly, the burden shifts back to the plaintiffs to discredit the employer's explanation. *See Aka,* 156 F.3d at 1289 (citing *McDonnell Douglas,* 411 U.S. at 804–805, 93 S.Ct. 1817).

### E. The Plaintiffs' Evidence of Discrimination

The plaintiffs assert that, because of its exhibited preference for younger workers, the USAID systematically set out to rid itself of its older workers. (Pls.' Opp'n to Defs.' Mot. for Summ. J. at 1.) The plaintiffs point to agency actions and statements by Defendant Atwood and other high-ranking USAID officials as proof. The plaintiffs claim that in 1993, shortly after Defendant Atwood became Administrator, the USAID reduced limited career extensions of Senior Foreign Service Officers, resulting in an approximately 45 percent decrease of the agency's workforce. (Pls.' Summ. J. Ex. 8, at pp. 84–85.) These reductions, the plaintiffs assert, occurred within the "agency's oldest workers," (Pls.' Summ. J. Ex. 1), and represent evidence of age bias that pervaded the USAID. (*See* Pls.' Opp'n to Defs.' Mot. for Summ. J., at pp 6–7.)

The plaintiffs submitted an article from *The Washington Post,* dated September 20, 1993, reporting on the forced separation of 50 senior Foreign Service officers. (Pls.' Summ. J. Ex. 33.) The article noted that previously these USAID employees had exceeded the allowable time in their grade without being promoted and had received limited career extensions exempting them from the "up and out" policy mandated at the USAID. (*Id.*) The article noted that the agency, under Defendant Atwood, has begun to take the up and out rules more seriously, and by not granting

exemptions, the USAID forced these 50 Foreign Service officers to leave the agency. (*Id.*) The article attributes to Defendant Atwood the following comment: "I don't believe the (personnel) system is working very well. I think a lot of the people on that list were very good people . . . but we just had to move them out so that we could move other, younger people through the system." (*Id.*) The article also quotes Defendant Atwood as stating that the USAID can no longer afford to operate as an "old agency." (*Id.*)

The plaintiffs also submitted the declaration of Dennis Chandler, a former USAID Foreign Service officer who had reached the position of Deputy Assistant Administrator for the Near East, the most senior career position in the Bureau.[3] (Pls.' Opp'n to Defs.' Mot. for Summ. J. Ex. 80, at ¶ 2.) Dennis Chandler comprised one of the 50 Senior Foreign Service officials terminated in 1993 when the agency decided not to grant him a limited career extension. (*Id.* at ¶ 6.) Dennis Chandler stated that Defendant Atwood called him in for a one-on-one conversation at the time of the dismissals. (*Id.* at ¶ 8.) According to Dennis Chandler, during this conversation Defendant Atwood said the USAID would "have to make room for young people." (*Id.*)

Additionally, Dennis Chandler stated that shortly after Defendant Atwood arrived at the USAID, top management made a judgment to "clean house" by reducing mostly senior career staff, including the targeting of older employees. (*Id.* at ¶ 4.) Additionally, Dennis Chandler stated that Defendant Atwood said he would "have to bring in new blood," while talking of the International Development Interns program. (*Id.*)

The plaintiffs also present the April 25, 1996 testimony of Defendant Atwood be-

fore the House International Relations Committee as evidence that the USAID protected younger employees in the International Development Intern program from the RIF. (Pls.' Opp'n to Defs.' Mot. for Summ. J. at 7.) Specifically, Defendant Atwood testified as follows: "We took extraordinary steps in those negotiations to protect our IDI class, our interns, the new people that have come in . . . . So I believe that those new people that have come in that are our new professionals—and our Agency needs that young blood—will be protected in this process." (Pls.' Summ. J. Ex. 34, at 2.)

The plaintiffs also point to the statements of key USAID officials as indicative of an "obsession" with the desire to maintain a younger age for its International Development Intern Program. (Pls.' Opp'n to Defs.' Mot. for Summ. J. at 7.) For instance, the plaintiffs submitted an internal memorandum from Frank Almaguer, the Deputy Assistant Administrator for Human Resources, stating that "IDI recruitment will be targeted for younger professionals." (Pls.' Summ. J. Ex. 42.) Additionally, Frank Almaguer wrote in the memorandum, describing the USAID's human resource needs, as follows: "In addition, we are an old agency (average age of Foreign Service officers is 48) and every year more and more employees are arriving at mandatory time in class limitations on age limits." (*Id.*)

Also, the plaintiffs submitted another internal memorandum by Frank Almaguer, which described the USAID's interns as "these brilliant, energetic young people." (Pls.' Summ. J. Ex. 44, at 1.) The plaintiffs also submitted yet another Frank Almaguer internal memorandum describing the International Development Interns as the "life blood of the Agency" because "they bring with them new ideas, new ways of

---

**3.** The defendants move to strike this evidence on the grounds that it is conclusory, does not set forth the declarant's competence, is contradicted by other evidence, and is ambiguous. (Defs.' Mot. to Strike at 4–5.) The court

concludes that the supplemental declaration of Dennis Chandler cures any purported defect. Accordingly, the court denies the defendants' motion to strike.

tackling problems, different skills sets and a vigor for the work." (Pls.' Summ. J. Ex. 26, at 1.)

The plaintiffs also submitted an internal memorandum from Anthony Cauterucci, the Director of the Office of Human Resource Development and Management, which discussed institutionalizing an International Development Intern program recruitment strategy. (Pls.' Summ. J. Ex. 32.) In the memorandum Anthony Cauterucci stated that the "continuation of current employment practices fails to address some major concerns: ... the Agency's grade and age structure." (*Id.* at 1.) The memorandum also noted that continuation of the International Development Intern program "would further diminish the average age of Foreign Service employees over time." (*Id.* at 6.) "[T]he lack of young professionals in the ranks of the Foreign Service has an impact beyond replacement. The infusion of new ideas and different approaches to problem solving are mandatory for a development agency." (*Id.* at 6.)

The plaintiffs also submitted the affidavit of Garber Davidson, a former USAID Foreign Service employee and the Vice President of the American Foreign Service Association, an employee union operating at the USAID.[4] In his affidavit Garber Davidson stated that while attending briefings by USAID Selection Board Panels he personally heard Administrator Atwood, Larry Byrne (Assistant Administrator for Management), and Frank Almaguer explain their belief that, in Davidson's words, "the agency had too many older people." (Pls.' Opp'n to Defs.' Mot. for Summ. J. Ex. 79, at ¶ 4.) Additionally, Garber Davidson stated that on more than one occasion he heard Defendant Atwood or Larry Byrne make comments to the effect that the senior ranks had too many older employees. (*Id.* at ¶ 5.)

## F. The Defendants' Response to the Plaintiffs' Evidence

Defendant Atwood submitted an affidavit controverting the statements by Dennis Chandler. (Defs.' Reply Ex. 40.) In his affidavit Defendant Atwood disputed Dennis Chandler's assertion that top management made a decision to clean house. (*Id.* at ¶ 3.) Defendant Atwood stated he did not know to what discussions Dennis Chandler alluded to and he (Atwood) did not have knowledge of discussions involving the targeting of older employees. (*Id.* at ¶ 3.)

Defendant Atwood further noted that in 1992, the year before he became Administrator, the General Accounting Office issued a report indicating that the USAID led the five foreign service agencies in the granting of Limited Career Extensions. (*Id.* at ¶ 3.) Defendant Atwood stated that that practice caused a "real problem" in managing the up-or-out system of the Foreign Service, so the Agency became more conservative in granting the extensions. (*Id.* at ¶ 3.) Defendant Atwood stated that nonetheless in each year since 1993 he has granted a number of Limited Career Extensions. (*Id.* at ¶ 4.) Additionally, Defendant Atwood stated that he did not make the comments that Dennis Chandler attributed to him when informing Dennis Chandler that he would not grant his Limited Career Extension. (*Id.* at ¶ 6.)

The defendants also argue that Administrator Atwood's testimony to Congress and Frank Almaguer's comments about the International Development Intern program do not relate to the RIF decision itself and consequently would require an inference to relate them to the RIF. (Defs.' Reply at 6–7.) Therefore, the defendants assert, the plaintiffs have not provided a nexus between Administrator Atwood's comments and the RIF decision and therefore the court should disregard his "stray" re-

4. The defendants move to strike this evidence on the grounds that it does not indicate which top management official made the comments and that it does not indicate to whom the top management officials made the comments. The court finds these objections to be without merit and therefore denies the defendants' motion to strike.

marks. (*See* Defs.' Reply at 8–10.) The plaintiffs, on the other hand, have provided an "EYES ONLY" action memorandum whereby Defendant Atwood approved the initial numbers of Foreign Service employees to become subject to a RIF in various skill-codes and to RIF at Foreign Service salary classes 1, 2 and Counselors, except for Secretaries. (Pls.' Summ. J. Ex. 38.)

### G. Genuine Issues of Material Fact

At this stage of summary judgment, the law permits the court to infer discrimination from the combination of the plaintiffs', prima facie case, any evidence that the plaintiffs present to attack the employer's proffered explanation for their actions, and any further evidence available to the plaintiffs, such as "discriminatory statements or attitudes on the part of the employer." *Aka*, 156 F.3d at 1289. This approach is especially necessary in discrimination cases because discriminatory intent is difficult to establish. *See Krodel*, 748 F.2d at 707. Drawing from affidavits, depositions, and answers to interrogatories, the nonmovant must identify specific facts indicating that a genuine issue exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The plaintiffs have presented several comments from Defendant Atwood that, when viewed in a light most favorable to the plaintiffs, *see Anderson*, 477 U.S. at 249, 106 S.Ct. 2505, reflect an intent or pattern or practice of replacing older USAID employees with much younger workers. Specifically, Defendant Atwood told *The Washington Post* that he intended to "move out" 50 senior Foreign Service officers in order to fill their slots with "younger people." Also, Defendant Atwood testified before Congress that the USAID needed "young blood." *Cf. Mangold v. California Pub. Util.*, 67 F.3d 1470, 1474 (9th Cir.1995) (concluding that the term "fresh young blood" supported a jury's verdict of age discrimination).

The plaintiffs have also presented evidence on other statements allegedly made by Defendant Atwood, which, if true, reflect an intent to replace older USAID employees with much younger workers. Specifically, Defendant Atwood allegedly told Dennis Chandler that he (Atwood) forced the separation of 50 senior Foreign Service officers to "make room for young people." Further, Defendant Atwood also allegedly told Dennis Chandler that the USAID needs "new blood." Defendant Atwood denies making these statements. At summary judgment the court cannot weigh such evidence and make a credibility determination as to what actually happened; rather, such a determination falls within the realm of a jury. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In addition to having the position of ultimate responsibility for actions taken by the USAID, as the head of the agency, Defendant Atwood's comments could very well carry great weight in terms of molding the agency's culture and beliefs. *Cf. Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir.1995) ("When a major company executive speaks, 'everybody listens' in the corporate hierarchy."). The evidence presented by the plaintiffs reflects the possibility of a "trickle down" impact on the agency's culture. A USAID top management official, Frank Almaguer, described the intern class, which the agency "protected" from the RIF, as consisting of "brilliant, energetic young people." *Cf. Hazen Paper*, 507 U.S. at 611, 113 S.Ct. 1701 (noting that motivation based on "stigmatizing stereotypes" based on age constitutes age discrimination); *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, (10th Cir.1996) (holding that stereotyped remarks can certainly constitute circumstantial or indirect evidence of discriminatory policy). Anthony Cauterucci, yet another USAID top manager, described the agency's "grade and age structure" as a "major" concern. Further, at a USAID Selection Board Panel meeting, USAID senior management (either Defendant At-

wood or Larry Byrne) said the agency had too many older people.

Drawing the inference in favor of the plaintiffs, this evidence, when considered as a whole, could lead a reasonable jury to conclude that USAID top management, including Defendant Atwood, had a concern about the older age of much of its foreign service staff, as well as an interest in replacing these workers with new, younger employees. Based on this, the court concludes that a genuine issue of material fact exists as to whether Defendants Atwood and USAID intentionally discriminated against the class of former Foreign Service employees who had obtained the age of forty years or older at the time of the RIF. Accordingly, the court denies the defendants' motion for summary judgment.[5]

## V. CONCLUSION

The court concludes that the ADEA does not allow for suits brought on a disparate impact theory. Therefore, the court grants the defendants' motion to dismiss the plaintiffs' disparate impact claim and denies as moot the plaintiffs' motion for partial summary judgment. The court also concludes that a genuine issue of material fact exists as to whether the defendants discriminated against the plaintiffs on the basis of their age in the RIF. Accordingly, the court denies the defendants' motion for summary judgment.

An appropriate Order directing the parties in a fashion consistent with this Memorandum Opinion is separately and contemporaneously executed and issued this 22 day of March, 1999.

---

**5.** After the defendants' motion for summary judgment became ripe the plaintiffs cited to new evidence consisting of a memorandum prepared by Maribeth Zankowski and a USAID recruitment notice. After the defendants filed a response the plaintiffs moved for leave to file a reply and for discovery. Because the court did not consider the plaintiffs' "new evidence" in deciding the motion for summary judgment, the court denies as moot plaintiffs request for leave to file a reply.