John E. **LUTES**, Plaintiff,

v.

Daniel S. **GOLDIN**, Defendant.

No. CIV. A. 96–2794(GK).

United States District Court, District of Columbia.

Aug. 30, 1999.

Gary Thomas Brown, Brown & Simons, L.L.P., Washington, DC, for Plaintiff.

John E. Lutes, Fairfax Station, VA, Pro se.

Eric Mark Jaffe, U.S. Attorney's Office, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KESSLER, District Judge.

This matter comes before the Court upon Defendant's Motion for Summary Judgment [# 35], Plaintiff's Motion for Partial Summary Judgment [# 46], and Defendant's Motion to Dismiss Second Amended Complaint, or, in the Alternative, for Summary Judgment [# 78]. Plaintiff, John E. Lutes, brings this action alleging discrimination on the basis of race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Plaintiff further alleges retaliation in violation of Title VII and the ADEA, as well as infringement upon his constitutional right to equal protection. Upon consideration of the parties' submissions and the entire record herein, for the reasons set forth below, Defendant's Motion for Summary Judgment is **granted**; Plaintiff's Motion for Partial Summary Judgment is **denied**; and Defendant's Motion to Dismiss Second Amended Complaint, or, in the Alternative, for Summary Judgment is **granted**.

## I. Background[1]

### A. Plaintiff's Employment History

Plaintiff, a fifty-four year old Caucasian male, was hired in October 1989 as an Aerospace Engineer in the Office of Aeronautics and Space Transportation, Code R Division, at the National Aeronautics and Space Administration ("NASA"). He was initially assigned a GS–14 classification. In October 1990, Plaintiff received a performance rating of "Outstanding". He received a slightly lower rating of "Highly Successful" in November 1991. In November 1992, Plaintiff received an even lower rating of "Fully Successful", well

---

1. Pursuant to Local Rule 108(h), "[i]n determining a Motion for summary judgment, the Court may assume the facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the Motion." The Court thus takes these facts from the parties' Statements of Material Facts Not in Dispute. Unless otherwise noted, the Court states only uncontroverted facts.

below the rating he expected. His performance ratings then rose to "Highly Successful" again in October 1993 and August 1994. Throughout his service with NASA, Plaintiff received various awards and recognitions.

### B. Plaintiff's Efforts at Promotion [2]

Plaintiff was hired into his current GS–14 position at full performance level with no promotion potential except through certain designated processes.[3] The only procedure for advancing beyond a full performance level position is 1) to separately apply for a vacant position at the next performance level, or 2) to request a review by a Performance Review Board ("PRB") or a desk audit to determine whether an increase in a position's duties supports reclassification at a higher performance level.

In 1990, Plaintiff's then supervisor, Jack Levine, allegedly promised Plaintiff that he would be promoted to a GS–15 position in late 1991. That promotion never took place. Plaintiff conceded in deposition that the denial of promotion by Levine had nothing to do with his race or gender. Def.'s Ex. 6 at 68.

Following receipt of his "Fully Successful" rating in November 1992, Plaintiff filed an informal grievance with the agency alleging improper supervisory practices. As part of his grievance, Plaintiff requested again that he be promoted to a GS–15 grade. That request for promotion was denied in January 1993. Plaintiff chose to withdraw his grievance rather than appeal its denial.

Subsequently, Plaintiff repeatedly requested that his name be submitted to a PRB for advancement consideration. The PRB for Plaintiff's division, Code R, is composed of Code R Division Directors, and is chaired by the Code R Associate Administrator. To be considered for a position upgrade, an employee must be nominated by his or her Division Director. The PRB then considers an employee's qualifications, his or her performance level, the potential to perform at a higher level, and other recommendations the employee may have garnered. The PRB then makes a determination whether to make a recommendation for upgrade to the Headquarters personnel office. Def.'s Ex. 4 at 5; Def.'s Ex. 10 at 63; Def.'s Ex. 11 at 19–20.

By 1993, Richard Christiansen occupied the position of Division Director for Plaintiff's division. Christiansen declined to submit Plaintiff's name for advancement review during the March 4, 1993 PRB meeting. In the face of repeated requests from Plaintiff, however, Christiansen finally nominated Plaintiff for upgrade, and advocated on his behalf before the August 25, 1993 PRB session. He did so only after his supervisor, Kristen Hessenius, Deputy Associate Administrator, suggested that rather than deny Plaintiff's requests himself, he allow the PRB to determine Plaintiff's qualifications. After a hearing, however, the PRB recommended unanimously against promoting Plaintiff.

---

2. While Plaintiff and Defendant both describe the relevant personnel action as a "promotion", it appears from the record that the Performance Review Board and desk audits actually examine a particular position to determine if that position has accreted sufficient responsibility to warrant a higher classification. Therefore, the promotion which Plaintiff seeks may be better described as a position "upgrade". Because the parties use the term "promotion" rather extensively, however, the Court will use both "upgrade" and "promotion" interchangeably.

3. Relying on various statistical data, Plaintiff argues that because the "journeyman" level for his position is GS–15, full performance level for the position is also GS–15. The SF–50 Form initiating personnel action for Plaintiff's position, however, explicitly states that at GS–14, "POSITION IS AT THE FULL PERFORMANCE LEVEL". Def.'s Ex. 1.

In any case, even if there was a genuine dispute over the question of whether full performance level for Plaintiff's position is GS–14 or GS–15, it is not material, since that fact has no bearing on whether Plaintiff was in fact qualified to hold a GS–15 designation, or whether Plaintiff suffered any discrimination.

Plaintiff chose not to appeal the PRB's determination.

In August 1994, at Plaintiff's request, Wesley Harris, the Code R Associate Administrator requested a desk audit of Plaintiff's position. In April 1995, Brenda L. Spicer, the Personnel Management Specialist who conducted the desk audit, issued a report concluding that Plaintiff's duties did not support a GS–15 classification. Def.'s Ex. 14. Ms. Spicer's supervisor, Peggy A. Phelps, concurred in the conclusion. Plaintiff opted not to appeal the determination despite being told he could do so.

In August 1995, Plaintiff was submitted for a second desk audit by the Chief of the Agency Personnel Policy Branch. On August 11, 1995, the Chief issued a report concluding again that Plaintiff's duties and responsibilities supported only a GS–14 classification. Def.'s Ex. 21. Again, Plaintiff declined to appeal the second desk audit.

### C. Procedural Background

Plaintiff filed an informal complaint with NASA's Equal Opportunity Office on February 7, 1995, alleging race and sex discrimination. He filed a second complaint on July 14, 1995, alleging race, sex, and age discrimination. Plaintiff has apparently filed at least five other administrative discrimination complaints.

On December 18, 1996, Plaintiff, acting *pro se,* filed this action alleging both disparate treatment and disparate impact discrimination. On May 7, 1997, Plaintiff filed an Amended Complaint with the assistance of counsel. The Amended Complaint alleged only disparate treatment discrimination. On October 5, 1998, this Court granted Plaintiff leave to file a second Amended Complaint. Plaintiff's second Amended Complaint added a cause of action for violation of his constitutional right to equal protection.

### II. Standard of Review

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989).

The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in its favor. *Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir. 1987).

In employment discrimination cases, summary judgment "must be viewed with special caution because intentional discrimination . . . [is] difficult for a plaintiff to establish." *Plummer v. Safeway, Inc.,* 1995 WL 129100, *1 (D.D.C. March 17, 1995) (citing *Johnson v. Digital Equip. Corp.,* 836 F.Supp. 14, 18 (D.D.C.1993)). Thus, this Court must take extra caution to examine all the evidence in the light most favorable to the plaintiff. *Ross v. Runyon,* 859 F.Supp. 15, 21–22 (D.D.C. 1994). If, on the basis of probative evi-

dence submitted in opposition to summary judgment under Fed.R.Civ.P. 56(e), a reasonable fact finder could infer discrimination, summary judgment for the defendant is inappropriate. *Hayes v. Shalala*, 902 F.Supp. 259, 264 (D.D.C.1995).

The Court's function in analyzing a motion for summary judgment is to determine whether the moving party has met its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Albritton v. Kantor*, 944 F.Supp. 966, 969 (D.D.C.1996). Once the moving party meets its burden, the burden shifts to the non-movant to "come forward with specific facts showing that there is a genuine issue for trial." *Cones v. Shalala*, 945 F.Supp. 342, 345–46 (D.D.C.1996) (citation omitted). "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions." *Albritton*, 944 F.Supp. at 970. Purely legal determinations are, however, the province of the Court. *Id.*

## III. Analysis

### A. Race and Sex Discrimination under Title VII

#### 1. Applicable Law

The Civil Rights Act of 1964, as amended, prohibits discrimination in federal employee personnel actions on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–16. To prevail in the typical Title VII action, a plaintiff must satisfy a three-part analysis. The Supreme Court wrote in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), that "the complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." The plaintiff must prove that the defendant acted with discriminatory intent, *General Bldg. Contractors v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), although he may use circumstantial evidence to satisfy that showing. *Thomas v. National Football League Players Ass'n*, 131 F.3d 198 (D.C.Cir.1997).

Once the plaintiff has made out a prima facie case, the burden of production shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its conduct. *McDonnell Douglas*, 411 U.S. at 802–05, 93 S.Ct. 1817. The burden then shifts back to the plaintiff to provide some evidence, either direct or circumstantial, that the articulated reason for the defendant's conduct is merely pretextual.[4]

Summary judgment "is appropriate where either the evidence is insufficient to

---

4. Plaintiff argues rather extensively that the Court should apply a "mixed motive" analysis to the instant case. Stemming from the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the "mixed motive" analysis provides an alternate route for a plaintiff to counter a defendant's assertion of a legitimate, non-discriminatory rationale for its actions. As our Court of Appeals discussed in *Thomas*, in the third stage of the *McDonnell Douglas* test, a plaintiff may marshal "direct" evidence in an attempt to "persuade the trier of fact by a preponderance of the evidence that [discriminatory motives] constituted a substantial factor in the defendant's action." *Thomas*, 131 F.3d at 202. Once the plaintiff makes such a showing, the burden shifts back to the defendant to demonstrate that "it would have taken the contested action even absent the discriminatory motive." *Id.* at 202–03.

Plaintiff's effort to invoke the "mixed motive" analysis in this case, however, must fail. Our Court of Appeals has explicitly stated that the "evidence marshaled in support of the substantiality of the discriminatory motive must actually relate to the question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated, forms of discrimination in the workplace." *Id.* at 204.

As the Court discusses below, Plaintiff's "direct" evidence consists almost exclusively of oblique references to various interviews and speeches given by Defendant Goldin. There is no evidence in the record directly linking any of Defendant's general commentary on diversity in the workplace to Plaintiff's failure to achieve promotion. The quantum of evidence proffered by Plaintiff is simply insufficient to support a "mixed motive" analysis.

establish a prima facie case, . . . or, assuming a *prima facie* case, there is no genuine issue of material fact that the defendant's articulated non-discriminatory reason for the challenged decision is pretextual." *Paul v. Federal Nat'l Mortgage Ass'n,* 697 F.Supp. 547, 553 (D.D.C.1988).

### 2. Plaintiff's Prima Facie Case

To establish a prima facie case of racial or gender discrimination under Title VII, Plaintiff must demonstrate that: 1) he applied for a position; 2) he was qualified for that position; 3) he was rejected for the position under circumstances giving rise to an inference of discrimination; and 4) other employees in the favored group with similar qualifications were promoted at the time that he was denied promotion. *Harding v. Gray,* 9 F.3d 150, 152 (D.C.Cir. 1993); *Parker v. B & O R. Co.,* 652 F.2d 1012, 1017 (D.C.Cir.1981). Courts in this jurisdiction have added the requirement in "reverse discrimination" cases that a Caucasian or male plaintiff "show additional 'background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Harding,* 9 F.3d at 153 (citations omitted); *see also Parker,* 652 F.2d at 1017; *Bishopp v. District of Columbia,* 788 F.2d 781, 786 (D.C.Cir. 1986).

Defendant does not dispute that Plaintiff requested an upgrade to GS–15 on repeated occasions, and was denied such an upgrade.[5] Rather, Defendant contends that Plaintiff was not qualified for upgrade and, in any case, discrimination played no part in the repeated denial of Plaintiff's requests for upgrade.

5. Defendant suggests that the fact that Plaintiff was not competing directly with other individuals for upgrade precludes him from bringing suit under Title VII. While most Title VII cases have arisen in the context of competition between the plaintiff and others for a coveted position, the potential for discrimination is no less under the circumstances presented here. Furthermore, repeated denial of upgrade, even in the absence of competition, bears great similarity to those types of adverse personnel actions, such as denial of training opportunities, which have been deemed actionable if committed in violation of discrimination statutes. *Lofton v. Roskens,* 743 F.Supp. 6 (D.D.C.1990); *Miller v. United States,* 603 F.Supp. 1244, 1249 (D.D.C.1985).

### a. Plaintiff's Qualifications

Plaintiff makes several arguments in support of his claim that he is qualified for upgrade to GS–15. First, Plaintiff provides a long list of various awards and accolades he has received throughout his career. Pl.'s Ex. 1 at 2–4. Plaintiff further states that Mr. Christiansen, the Code R Division Director, advocated strongly on behalf of his upgrade before the August 25, 1993 PRB meeting. Plaintiff adds that Christiansen's advocacy was suggested by Dr. Kristen Hessenius, then-Code R Deputy Associate Administrator. Finally, Plaintiff states that NASA recently sent him a letter acknowledging another application he submitted for upgrade to GS–15 *in another division,* which states that he is performing at a level commensurate with a GS–15 grade. Pl.'s Ex. 45.

Despite demonstrating that Plaintiff had an exemplary performance record as a GS–14, the record is replete with repeated determinations by different agency officials that, during the relevant time period, Plaintiff's position and his performance in it did not justify an upgrade to a GS–15.

As early as 1991, Jack Levine, Plaintiff's then-supervisor, denied Plaintiff a requested upgrade. Plaintiff admitted in his deposition that the denial of upgrade by Levine had nothing to do with his race or gender. Def.'s Ex. 6 at 68.

In November 1992, Plaintiff received a rating of only "Fully Successful", rather than "Outstanding" or "Highly Successful" as he had expected. In response, he filed an informal grievance alleging improper supervisory practices in January 1993, in which he also requested a position upgrade as a means of resolving the grievance.

John McCarthy, his supervisor at the time, responded in writing:

> I have reviewed your current duties with Mr. Richard Christiansen and find that they comprise essentially the same level of scope and responsibility as those of your previous position description of record. Those duties were classified at the GS–14 level. Therefore, I find that your current duties are those of a GS–14 level Program Manager.
>
> In conclusion, *neither the past supervisory practices that you allege, nor the duties of your current position are supportive of your advancement to the GS–15 grade level.* Therefore, the relief you seek cannot be granted.

Def.'s Ex. 8 (emphasis added). Plaintiff later withdrew his informal grievance. Def.'s Ex. 9.

Plaintiff also sought a position upgrade by requesting a presentation before the PRB. Richard Christiansen, later the Division Director, testified at deposition about his motivations in nominating and advocating on Plaintiff's behalf before the August 25, 1993 PRB. His testimony shows that, contrary to Plaintiff's belief that Christiansen supported his upgrade, Christiansen actually "had reservations of putting him [Plaintiff] in [before the PRB] because I did not feel he had been performing at the level [to support upgrade]." Def.'s Ex. 5 at 61. In fact, Christiansen testified that he submitted Plaintiff's name for consideration only after receiving repeated requests from Plaintiff, and after soliciting advice from Dr. Kristen Hessenius, the Deputy Associate Administrator. Dr. Hessenius, after hearing of Plaintiff's repeated requests for upgrade, essentially suggested to Christiansen that rather than continuing to reject Plaintiff's requests himself, he nominate Plaintiff for an upgrade and permit the three-person PRB to make a collective determination of Plaintiff's qualifications. Def.'s Ex. 5 at 58.

Plaintiff fared no better before the PRB. Even upon consideration of Christiansen's advocacy, the PRB unanimously concluded that Plaintiff's level of responsibility was insufficient to warrant upgrade on the basis of accretion of duties. Def.'s Ex. 4 at 5. While the PRB did not issue a written statement denying Plaintiff's upgrade request, several of the members of the PRB were deposed on the issue.

Richard A. Reeves, a fifty-five year old Caucasian male and a former Deputy Associate Administrator for Code R, testified that he was "very surprised that he [Plaintiff] was submitted.... And I [Reeves] recall raising my concerns about his ability to step up to the new way of doing business and his ability to manage strategically [sic] programs at a strategic level." Def.'s Ex. 10 at 71. Similarly, Vincent Rausch, a fifty-five year old Caucasian male who sat on the August 25, 1993 PRB, stated in an affidavit that

> I [Rausch] had serious concerns about John's [Plaintiff's] abilities during these deliberations and I did not feel his work currently being performed was at the GS–14 level. The deliberations were for promotion to GS–15, so obviously, I did not see him as being promotion material to GS–15. John complains about not being promoted, yet I have not seen him conduct himself in a way that would indicate he has the skill level or competence to perform at the GS–15 level.

Def.'s Ex. 13 at 4–5. Louis Williams, a fifty-seven year old Caucasian male and former Director of Code R's High Speed Research Division, stated in an affidavit that

> He [Plaintiff] had been very slow to get "out front" and perform in a manner which exemplified the responsibility and accountability of a GS–15.... I would have expected to see very technical presentations and work which demonstrated his ability to perform without supervisory guidance. I did not see him making the type of presentations required, in my opinion, to warrant GS–15 consideration.

Def.'s Ex. 12 at 5.

Significantly, each of the members of the August 23, 1993 PRB stated without equiv-

ocation that race and gender played no part in the promotion consideration. Def.'s Ex. 11 at 28; Def.'s Ex. 10 at 76; Def.'s Ex. 12 at 6; Def.'s Ex. 13 at 5.[6] Plaintiff made no effort to appeal the PRB's denial of upgrade.

Despite the PRB's determination, Plaintiff made further requests for a position upgrade. Dr. Wesley Harris, the Code R Associate Administrator at the time, made a special request on 'Plaintiff's behalf to the agency Personnel Office in 1994 to conduct a desk audit of Plaintiff's position to verify whether it supported a GS–15 grade. After consulting with Plaintiff's supervisor, directly with Plaintiff, and then reviewing Plaintiff's duties compared with a departmental grade-evaluation guide, Brenda Spicer concluded in a written statement issued April 1995 that:

> This position has inherently been classified at the GS–14 level due to the complexity and scope of the functions and programs assigned. Since these types of functions and programs are typically classified at the GS–14 level, I cannot envision this position growing to the GS–15 level without the assignment of additional program areas that are typically classifiable at the GS–15 level.

Def.'s Ex. 14 at 10A–1.

The results of the desk audit were in turn reviewed and confirmed by Peggy Phelps, Ms. Spicer's supervisor. Importantly, Ms. Spicer submitted a sworn affidavit attesting that she had no discriminatory motive while conducting the desk audit, and that she had no knowledge of Plaintiff's discrimination complaints until well after completion of the desk audit and publication of its conclusions. Def.'s Ex. 17 at 11.[7] Plaintiff took no measures to appeal the results of the desk audit even though he was informed that he could do so.

A second desk audit, conducted by a different individual in August 1995, arrived at a similar conclusion that Plaintiff's position was appropriately designated GS–14, and not GS–15. The second desk audit

---

6. While the Court recognizes that many of these statements are self-serving, Plaintiff has made no effort to challenge their veracity or impartiality. Plaintiff has therefore failed to raise any disputed issues of material fact, as required by Fed.R.Civ.P. 56.

7. Plaintiff contends that the desk audit prepared by Ms. Spicer was deliberately delayed for a period of nearly eight months so that Defendant could reduce Plaintiff's duties, thereby guaranteeing a lower assessment of his responsibilities. Specifically, Plaintiff cites to two instances where funding was withdrawn for his projects, one involving removal of tails from commercial aircraft and the second related to X–31 aircraft.

Plaintiff has not provided any evidence to support his blanket statement, however, that Defendant delayed the desk audit in order to discriminate against him. Rather, Ms. Spicer stated in her affidavit that the delay in conducting the desk audit was attributable to a number of other high priority projects for which she was responsible. Def.'s Ex. 33 at 5.

Furthermore, Wesley Harris, the Associate Administrator for Aeronautics stated that with respect to the first project, funding was pulled after three separate flight center directors and the Deputy Associate Administrator determined that the project was technically unsound. Def.'s Ex. 4 at 7.

With respect to the X–31 aircraft project, Christiansen testified in deposition that the project was actually under the auspices of DARPA, the Defense Advanced Research Projects Agency. Def.'s Ex. 5 at 120. While the record is not clear as to the role NASA played in the X–31 project, Christiansen's testimony suggests that NASA merely oversaw the project for DARPA. Id. at 112. As such, NASA pulled funding for the X–31 program under the belief that DARPA should fund the project, which it ultimately did. Id. at 122.

Plaintiff himself testified at deposition that several NASA officials were upset after concluding that the project should be funded by DARPA. As he characterized it, one NASA deputy "was really angry because he thought that [D]ARPA was trying to make a grab for NASA money." Def.'s Ex. 6 at 117.

The record therefore suggests that NASA's withdrawal of funding for the aircraft tail project and the X–31 project were driven by concerns of technical merit and agency funding. Plaintiff has provided no evidence, other than an unsubstantiated blanket assertion, to indicate that discrimination was a motivating factor.

report set forth methodically the criteria for each of grades GS–14 and GS–15, and performed a criterion-by-criterion assessment of Plaintiff's position. The report concluded that:

> In comparison with the criteria in the standard for Product Development Engineering Positions at the GS–14 and GS–15 levels, this position corresponds with the GS–14 level, but does not meet the GS–15 level. In terms of assignment characteristics, most of the specific project and program areas assigned to the incumbent are not of fundamental significance in establishing overall agency research and development goals and missions, as is characteristic of GS–15, but rather arise from already established goals and missions. In addition, most of the fields involved are not recognized as rapidly evolving or involving pioneering development efforts as at GS–15. In terms of the level of responsibility, the evidence is that the incumbent is not recognized as the final NASA technical authority in his area of responsibilities; does not, on a regular and recurring basis, provide authoritative advice to the highest levels of NASA management in establishing mission objectives and overall program goals, or in managing highly advanced and important development projects; and does

8. It is important to note that neither desk audit report makes any reference to Plaintiff's interpersonal skills or other subjective factors. Each purports to be an assessment solely of the responsibilities of Plaintiff's position.

9. Plaintiff attempts, briefly, to attack the qualifications of the members of the PRB. Plaintiff's criticisms address, however, the adequacy of the PRB process, not the question of discrimination.

10. The Court's conclusion is not meant to cast any aspersions on Plaintiff's qualifications to hold his current GS–14 position. On the contrary, as Plaintiff's employment history and collection of awards demonstrate, Plaintiff is in all likelihood well qualified for a GS–14 position. That, however, is not a basis for concluding that Plaintiff is in fact qualified to hold a GS–15 position.

not, on a regular and recurring basis, provide engineering advice and guidance to NASA managers on matters of such difficulty that leading experts disagree as to the proper approach to or probable outcome of significant and far-reaching development efforts.

Def.'s Ex. 21 at 7–8.[8] Plaintiff declined to appeal the results of the second desk audit as well.

 Thus, the thrust of every single agency comment and review on the record is that, while Plaintiff was certainly performing adequately in his GS–14 position, the level of responsibility that position entailed simply did not support an upgrade to GS–15. The simple, undisputable fact is that on five separate occasions, five separate individuals or groups of individuals independently evaluated Plaintiff's position and determined that it did not possess the necessary qualifications to warrant an upgrade. At no point did Plaintiff ever appeal any of those determinations. Furthermore, Plaintiff has failed to challenge any of the evidence offered by Defendant on the issue of his qualifications.[9] Therefore, in the absence of any genuine issues of material fact, the Court concludes that Plaintiff has failed to establish that he was qualified for an upgrade, a crucial element of a Title VII prima facie case.[10]

> Other courts in this jurisdiction have faced a similar quandary of how to treat plaintiffs who are close to the line when it comes to establishing their qualifications. In *Neuren v. Adduci Mastriani Meeks & Schill*, 43 F.3d 1507 (D.C.Cir.1995), for example, our Court of Appeals gave a plaintiff with a weak case the benefit of the doubt, concluding that she had established minimal qualifications as part of her prima facie case of sex discrimination. The Court then turned around, however, and used the exact same evidence of her weak qualifications to conclude that the defendant had terminated her for legitimate, non-discriminatory reasons.

> Here, upon consideration of the extensive record and Plaintiff's failure to rebut individual testimony and affidavits, the Court concludes that Plaintiff has fallen short of the necessary showing that he is qualified for a promotion.

### b. Background Circumstances of Discrimination

Even if Plaintiff were able to establish the minimum requisite qualifications for an upgrade to GS–15, he is both unable to demonstrate background circumstances which would identify NASA as the type of unusual employer who discriminates against the majority, and unable to establish that such discrimination played a substantial factor in the denial of his upgrade requests. Because Plaintiff relies on the same set of evidence to support both prima facie elements, the Court will consider the two in conjunction.

In support of his claims that the denial of his upgrade is attributable to discrimination, and that NASA is the type of unusual employer who discriminates against the majority, Plaintiff cites three types of evidence. First, he proffers various statistics suggesting that minority applicants are receiving disproportionate shares of promotions. Second, he cites to a number of speeches and interviews given by Defendant Goldin which advocate diversity in the workplace. Finally, Plaintiff argues that the mere existence of NASA's Equal Opportunity and Diversity Management Plan ("Equal Opportunity Plan") reveals an agency-wide predilection to discriminate against older Caucasian males.[11]

### i. Plaintiff's Statistical Proffer

■ Plaintiff's first contention is easily disposed of. The statistical proffer which he relies upon to demonstrate discrimination is fundamentally flawed in a number of ways. Pl.'s Ex. 18. A careful examination of Plaintiff's statistics reveal that the vast majority of individuals included are not similarly situated to Plaintiff. As an initial matter, Plaintiff's report includes individuals seeking upgrades from grades GS–13, GS–14, and GS–15, as well as within SES. Furthermore, Plaintiff's statistics report promotion records across a span of years from 1992 to 1996. Plaintiff has failed to identify which of the many individuals listed are similarly-situated to himself, and which, if any, were promoted by the August 25, 1993 PRB which rejected Plaintiff's upgrade. The statistical analysis also includes individuals who were promoted by "career ladder" or through application for advertised positions, neither of which Plaintiff pursued.[12]

Our Court of Appeals has repeatedly held that a Title VII plaintiff must "demonstrate that all of the relevant aspects of [his or] her employment situation were 'nearly identical' to those of [employees in the favored category]." *Neuren,* 43 F.3d at 1514; *Valentino v. United States Postal Serv.,* 674 F.2d 56, 69 (D.C.Cir.1982). By failing to provide data comparing Plaintiff with similarly situated minority employees, Plaintiff's statistical analysis is largely irrelevant.[13]

Furthermore, Plaintiff's statistics provide little context for their analysis. Plain-

---

11. Plaintiff also tries to introduce an administrative complaint filed by William Huddleston and an affidavit from William S. Clement, both Caucasian male employees of NASA. Pl.'s Ex. 2 to Opp'n to Def.'s Mot. to Dismiss Second Amended Compl.; Pl.'s Ex. 3 to Opp'n to Def.'s Mot. to Dismiss Second Amended Compl. Pursuant to Fed. R. Civ. Pro. 56(e), however, because Plaintiff has no personal knowledge of the facts alleged in Huddleston's Complaint and Clement's Declaration, both are inadmissible hearsay. Furthermore, Plaintiff has made no effort to demonstrate that Mr. Huddleston and Mr. Clement are similarly situated in any way, other than their race and gender. Accordingly, the Court declines to give any weight to those exhibits.

12. In fact, of the employees who may be considered similarly situated to Plaintiff, one of the two who received upgrades to GS–15 through the PRB process was a Caucasian male.

13. Plaintiff has requested additional personnel data pursuant to Fed. R. Civ. Pro. 56(f). Because it is undisputed that upgrades are granted upon review of each individual's position, rather than on the basis of competition between employees, the comparative employment data sought by Plaintiff will not change the Court's analysis. Therefore, the Rule 56(f) motion is denied.

tiff declines to mention that his statistical report encompasses a time period where NASA was experiencing significant agency-wide downsizing. As a result, the number of hires and promotions were far lower for all categories of applicants, not just Caucasian males. Such a material omission further detracts from the credibility of Plaintiff's data.

The Court further notes that Plaintiff has alleged only disparate treatment discrimination, opting to drop the disparate impact claim in his original Complaint. Our Court of Appeals has held that "[i]n individual disparate treatment cases... statistical evidence is less significant because the ultimate issue is whether the particular plaintiff was the victim of an illegitimately motivated employment decision." *Krodel v. Young,* 748 F.2d 701, 710 (D.C.Cir.1984). The Court of Appeals added that while such evidence is not entirely irrelevant, its "usefulness depends on all the surrounding facts and circumstances." *Id.* (citations omitted). In the instant case, given Plaintiff's failure to limit statistical data to similarly situated employees and the fact that Plaintiff has brought an individual disparate treatment case, the Court finds no basis for according any significant weight to Plaintiff's statistical analysis.

### ii. Defendant's Speeches and Public Statements

Plaintiff dedicates the bulk of his Motion for Partial Summary Judgment to citing various speeches and interviews given by Defendant Goldin regarding the need to increase diversity in the workplace. These statements, Plaintiff alleges, support his prima facie case that NASA is predisposed to discriminate against Caucasian males, and that discrimination was the reason he was denied an upgrade. While the Court will not repeat every single quotation cited by Plaintiff, a closer examination of several of the passages deemed by Plaintiff to be the most "egregious" is instructive.

Plaintiff cites an interview Defendant Goldin gave in the Winter 1993 issue of *U.S. Black Engineer.* Specifically, Plaintiff quotes one passage, where Defendant Goldin states:

> I make it a point to almost always discuss it [cultural diversity]. I take a look at the numbers.... [When I arrived] out of 535 senior executive service slots there were 14 African Americans and then I checked the Hispanic Americans and the Asian Americans and it was unbelievable. So I put a freeze on any new SES promotions until I had a plan from each of my direct reports that they had a training program in place to get more of a cultural diversity. They really stepped up to it and now we have a special training program to enter the senior executive service and bring along about 50 people, of which 25 percent are minority Americans.

Pl.'s Ex. 10. Plaintiff argues that this passage demonstrates Defendant's overzealousness in promoting diversity.

What Plaintiff fails to consider, however, is the context of the quoted passage. Not only is Defendant referring to a training program for senior executives, a situation inapplicable to Plaintiff, Goldin continues in the passage:

> The object is just not [sic] to put people in slots, because if you don't earn it, you won't have the respect of your peers....
> It is not enough to say Harry or Jane is the smartest person to get the job. Rather it's, does Harry or Jane have the sensitivity to cultural diversity it takes to get the job? If not, then in the new society they can't really be managers.

*Id.* Goldin clearly recognized, upon observation of NASA's workforce, that various barriers stood in the way of advancement for women and minorities in the agency. His efforts to address NASA's diversity problems emphasized not that individuals are to be promoted on the basis of their race or gender, but rather, that their sensitivity to this agency-wide concern would be one of many criteria for selection.

Viewed in its entirety, then, Defendant's statement supports the goal of advancing individuals who recognize workplace diversity as a value, and who are willing and able to manage a diverse workforce.[14]

In another speech given by Defendant Goldin before an audience at Jet Propulsion Laboratories, he states

Congress is more representative of what America looks like and many of the women, many of the minority Americans don't feel the space program has been responsive to all of America. The image of the space program is Mission Control at JPL or Mission Control in Houston. And generally what you see are white male[s], with white shirt [sic] sleeve shirts. And I'm not saying that being a white male is bad, but what I'm saying is that if America owns this program—and they're our customer... if this is their program, they darn well better feel that this program belongs to all Americans and the program [better] look just like America.

Pl.'s Ex. 14 at 9.

Plaintiff further cites to a NASA-wide talk Defendant Goldin gave regarding "streamlining". In that discussion, Goldin states:

Another thing we know for sure is that we'll maintain cultural diversity. Diversity isn't just a buzzword. It's not just a fad. It's important to the people of this Agency. It's important to the people of this country. This is America's space and aeronautics program. We're designed to serve our country and uplift its people. *All* of its people.

14. In that same speech, Goldin noted that "if you don't earn it [promotion], you won't have the respect of your peers. . . ." *Id.*

15. Plaintiff failed to note, however, General Dailey's explanation of the phrase as:
frustration over the difficulty that we were facing in an organization that was getting smaller and was going to therefore have less hiring and promotional opportunities

Pl.'s Ex. 15 at 5 (emphasis in original). What Plaintiff fails to include, however, is Defendant's subsequent comment:

We are becoming *more* inclusive, not less. Women and minorities have not had the opportunities others have had. We're changing that. We're opening the doors of NASA at all levels *to the best person for the job*. That doesn't mean that suddenly, we value one group and not another. That's not what diversity is. Diversity is including everybody. *Each person gets to go as far as their talents can take them.*

*Id.* (emphasis added).

In another speech before the Space Foundation Conference, Defendant Goldin stated:

It'll [NASA] also have a labor force that's going to reflect the full cultural diversity of America so a young child in South Central LA [Los Angeles] will not have to have the anxiety that there's no hope for them but they can look up and see the people around them working in science, math and physics because the space program brought them in. We won't have [a] space program that will be made up of white middle age males but we'll have a space program in all aspects that will be made up of the full cross section of America and this will not happen in twenty five years, this is going to happen in three to eight years.

Pl.'s Ex. 7 at 5.

As a final note, Plaintiff cites repeatedly to a phrase that Defendant occasionally used, describing the workforce of NASA as "too frail, too pale, to [sic] male and too stale". Pl.'s Ex. 4 at 21 (deposition of General John Dailey, the then acting Deputy Administrator for NASA).[15] This

available to us... that it was going to be very difficult to achieve any—these goals of diversity... because of the fact that we had such a predominance of white males, that getting women and minorities in the work force was going to be a difficult activity. *Id.* at 21–22. General Dailey further testified that the phrase was one in existence at NASA before Goldin arrived at the agency, and that

statement, Plaintiff claims, represents the epitome of Defendant's attitude, and demonstrates the environment of discrimination against the majority within NASA.

 All of the cited passages clearly show that Defendant had a significant concern for diversity in the workplace. The question, however, is whether Defendant's comments are sufficient to establish that NASA is the type of unusual employer who would discriminate against the majority, and that discrimination was the reason for denying Plaintiff an upgrade. The Court concludes that they do not.

Each of the statements quoted above, taken in context, demonstrates one thing only. Each illustrates Defendant's concern that women and minorities within NASA are not reaching their full potential, and are not given the same equality of opportunity as Caucasian males. Not one of the many quoted passages suggests that Caucasian males are to be disadvantaged in favor of women or minorities, and none state that a less qualified minority or woman applicant should ever be given any preference. In fact, in several of the quoted passages, Defendant affirms the principle that *all* individuals, regardless of their gender or race, will be provided equal opportunities, and that the most qualified person will be rewarded. Clearly, Defendant Goldin's public comments reveal his intent to *remove* barriers to women and minorities, not to erect them for Caucasian males.

Furthermore, Plaintiff can point to no evidence whatsoever to demonstrate that Defendant's attitude towards diversity affected Plaintiff's individual employment situation. Nor can Plaintiff demonstrate that Defendant had any intention or motive to discriminate against him. None of the public statements or interviews were in any way directed towards Plaintiff and none mentioned Plaintiff individually. Courts in this jurisdiction have held that a plaintiff must demonstrate that the speaker had some role in the adverse personnel action before even discriminatory remarks will support a discrimination claim. *Goss v. George Washington Univ.*, 942 F.Supp. 659, 664 (D.D.C.1996); *Garrett v. Lujan*, 799 F.Supp. 198, 200 (D.D.C.1992).

To that end, Plaintiff goes to some effort to establish that Defendant Goldin personally reviews employment decisions. For instance, Plaintiff cites to General Dailey's answer at deposition to the question of who reviews PRB recommendations. General Dailey responded:

> The final decision is made by the Administrator, based on the recommendation of the PRB. All I do is review it for—and from this standpoint—in case there [are] any deviations or waivers or anything that they're recommending. If it comes forward as a straight recommendation, I pass it to the Administrator without comment, normally.

*Id.* at 36. General Dailey's response, however, does not support Plaintiff's contention that Defendant Goldin was personally responsible for his denial of upgrade. Dailey's response merely confirms the fact that Defendant Goldin reviews the promotion recommendations of the PRB before those recommendations are forwarded to the personnel office for processing. In the instant case, Plaintiff was *rejected* for upgrade by a unanimous vote of the August 25, 1993 PRB. Given the fact no recommendation issued from the PRB, there is no evidence whatsoever that the PRB's decision to deny Plaintiff an upgrade even reached Goldin for review.

Furthermore, General Dailey testified that he, as the intermediary between the PRB and Defendant Goldin, does not know Plaintiff and has no knowledge of his efforts to seek an upgrade. *Id.* at 35. There is similarly no evidence that Defendant Goldin had any personal knowledge of Plaintiff's requests for an upgrade, much less that he made a discriminatory decision to deny the upgrade. The fact of the mat-

the phrase caught his attention once he heard it. *Id.* at 22.

ter is that Plaintiff cannot demonstrate that Goldin had either a personal involvement in his promotion decisions or the intent to discriminate against him. Accordingly, Plaintiff's efforts to establish a causal link between Defendant's public speeches and statements and his own denial of upgrade fail.

### iii. NASA's Equal Opportunity Plan

Plaintiff finally contends that NASA's Equal Opportunity Plan provides evidence that NASA is the type of unusual employer that discriminates against the majority. Plaintiff's argument is flawed, however, for multiple reasons.

■ Not only is it disputed whether NASA's Plan even exists anymore, Plaintiff provides no evidence that the Plan actually affected his individual employment situation. In fact, Plaintiff has essentially conceded that NASA's Equal Opportunity Plan was not developed until well after he was rejected for an upgrade by the PRB. Pl.'s Mot. for Summ. J. at 22.

Plaintiff cites in his argument to the deposition of General Dailey and the actual Equal Opportunity Plan itself, both of which state that the Plan came into existence in September 1994. Pl.'s Ex. 4 at 13; Pl.'s Ex. 8. Plaintiff was rejected·for promotion by the PRB in late 1993, however, nearly a year before the issuance of the Equal Opportunity Plan. As such, the Equal Opportunity Plan could *not* have had any discriminatory effect on the PRB's determination of Plaintiff's qualifications. *Cerrato v. San Francisco Community College Dist.*, 26 F.3d 968, 976 (9th Cir.1994).

Furthermore, with respect to the two desk audits, whose final reports were issued following publication of the Equal Opportunity Plan, Plaintiff has not provided any evidence that the Plan affected in any way the conclusion those desk audits reached. The reports themselves lay out a systematic criterion-by-criterion comparison of Plaintiff's responsibilities with those of the standard GS–15 position. Def.'s Ex. 14; Def.'s Ex. 21. Brenda Spicer, the official who conducted the first desk audit, further stated in an uncontested affidavit that "diversity" concerns played no part at all in her assessment of Plaintiff's responsibilities. Def.'s Ex. 17.

■ Although Plaintiff has gone to great efforts in each of his pleadings to describe the Equal Opportunity Plan, he has *nowhere* indicated how the existence of that Plan affected his individual employment situation. While our Court of Appeals has previously stated that the existence of an affirmative action plan may be one factor suggesting discrimination against the majority, that factor, standing alone, is insufficient to support a finding of discrimination. *Bishopp*, 788 F.2d at 787. Here, Plaintiff's failure to link the existence of the Plan to his individual claims of employment discrimination is fatal to his Title VII claim.

Despite the voluminous pleadings and extensive, often convoluted, factual background of this case, the Court reaches several conclusions. Based upon the evidence in the record, it is clear that Plaintiff's position, during the relevant time period under consideration, did not warrant an upgrade to GS–15. Plaintiff cannot, therefore, establish that he was qualified for promotion. Furthermore, Plaintiff cannot demonstrate that NASA is the unusual employer who discriminates against the majority. Plaintiff's unreliable statistical analyses, as well as his references to Defendant's speeches and the existence of the Equal Opportunity Plan, are of little relevance in the absence of any evidence on the record linking those factors to Plaintiff's own employment situation. In the absence of any material facts in dispute, and in light of Plaintiff's failure to establish a prima facie claim of either race or gender discrimination, Defendant's Motion for Summary Judgment must be granted with respect to those counts.[16]

**16.** Even if Plaintiff had established a prima facie claim of race or gender discrimination,

## B. Age Discrimination under the ADEA

In addition to his claims of race and gender discrimination, Plaintiff also alleges age discrimination in violation of the ADEA. Courts have applied the *McDonnell Douglas* tripartite analysis to claims under the ADEA as well. To establish a prima facie case under the ADEA, plaintiffs must demonstrate that they: (1) belong to the protected age group (age 40 or over), (2) were qualified for their positions, (3) were terminated, and (4) were disadvantaged in favor of younger persons. *Evans v. Atwood,* 38 F.Supp.2d 25, 31 (D.D.C. 1999) (citations omitted).

■ Plaintiff indisputably falls into the protected age group, and was denied his upgrade to GS–15. With respect to the element of being disadvantaged in favor of younger persons, however, Plaintiff provides virtually no support. While Plaintiff spends almost the entirety of each of his pleadings detailing the bases for his race and gender discrimination claims, he spends almost no time addressing his age related claim.

With the exception of Defendant Goldin's occasional statement that the NASA workforce is "too frail, too pale, to [sic] male and too stale", Plaintiff has provided no evidence to support his claim of age discrimination. Not one of the many passages quoted by Plaintiff in support of his discrimination claims mentions the age of an employee as a liability, or even suggests that younger employees might have an advantage over older ones. Rather, Defendant's many public statements promote equality of opportunity for all sectors of the workforce.

Furthermore, as discussed above, Plaintiff is unable to establish that he was qualified for promotion to GS–15. Accordingly, the Court concludes that Plaintiff has failed to establish a prima facie case of age

discrimination. Defendant's Motion for Summary Judgment must therefore be granted on Plaintiff's claim of age discrimination.

## C. Retaliation under Title VII and the ADEA

■ To sustain a retaliation claim under Title VII and the ADEA, a plaintiff must establish that: 1) he or she engaged in statutorily protected activity; 2) he or she was subjected to adverse personnel action; and 3) a causal connection exists between the adverse action and the protected activity. *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985); *Paquin v. Federal Nat'l Mortgage Ass'n,* 119 F.3d 23, 31 (D.C.Cir. 1997).

■ Plaintiff alleges that Defendant retaliated against him for his EEO complaints by not promoting him to a GS–15 grade. Plaintiff was denied upgrade by the PRB in August 1993. He did not file his first EEO complaint, however, until February 7, 1995, nearly a year and a half later. Clearly, there can be no causal connection between engaging in protected activity and adverse personnel action when the latter precedes the former.

Plaintiff concedes that his unsuccessful PRB bid took place prior to his EEO complaint. He contends, however, that he was also denied upgrade by desk audit in April 1995, two months after he filed his first EEO complaint. While such a short time period might otherwise support an inference of causal connection, Plaintiff's retaliation claim is fundamentally flawed for another reason.

In none of his pleadings does Plaintiff even suggest that Brenda Spicer, the Personnel Management Specialist who conducted the initial desk audit, knew or had any reason to know of his prior EEO activity. In fact, Ms. Spicer states in a

the record is still replete with evidence that Defendant denied the requested upgrade to GS–15 because Plaintiff's position simply did not support it. As such, the Court's extensive discussion of Plaintiff's qualifications would compel the conclusion that Plaintiff was denied promotion for legitimate, non-discriminatory reasons.

sworn affidavit that she had no knowledge of Plaintiff's prior complaints of discrimination or of his participation in the EEO process. Def.'s Ex. 33 at 5. Ms. Spicer was notified of such information only after the desk audit had been completed.

Given Ms. Spicer's sworn statement and Plaintiff's failure to rebut it in any way, the Court concludes that Plaintiff has not established a prima facie case of retaliation under Title VII or the ADEA. Accordingly, Defendant's Motion for Summary Judgment is granted as to Plaintiff's claim of retaliation.

### D. Equal Protection

In August 1998, with the Court's leave, Plaintiff filed a Second Amended Complaint adding a claim of unconstitutional denial of his right to equal protection.[17] Although Plaintiff's Complaint makes only bare allegations of constitutional violation, in the course of briefing Defendant's Motion to Dismiss Second Amended Complaint, Plaintiff clarified that he is challenging the constitutionality of NASA's affirmative action program, the Equal Opportunity Plan.

Courts have long recognized the general principle that "the United States, as sovereign, 'is immune from suit save as it consents to be sued... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *Lehman v. Nakshian,* 453 U.S. 156, 160, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981) (citations omitted). The United States has waived its sovereign immunity in federal employment discrimination disputes through Title VII and the ADEA.

Defendant now cites to *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), contending that Plaintiff, as a federal employee suing the federal government, is barred from bringing a constitutional claim premised on employment discrimination.

In *Brown,* the Supreme Court considered the question of what remedies are available to a federal employee suing the federal government alleging discrimination. Upon examination of the extensive legislative history behind Title VII, the Court noted that the unambiguous legislative intent was to create an "exclusive, preemptive administrative and judicial scheme for the redress of federal employment discrimination." *Id.* at 829, 96 S.Ct. 1961. A statute which "provides for a careful blend of administrative and judicial enforcement powers," the Supreme Court determined, is "inconsistent with the... contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief." *Id.* at 832–33, 96 S.Ct. 1961.[18]

Courts in this jurisdiction have relied upon *Brown* and *Thorne* repeatedly to bar constitutional challenges arising under claims of federal employment discrimination. In *Ethnic Employees of the Library of Congress v. Boorstin,* 751 F.2d 1405, 1414–15 (D.C.Cir.1985), for instance, our Court of Appeals noted that the Supreme Court in *Brown*

> showed particular concern over the possibility that litigants might evade "the rigorous administrative exhaustion requirements and time limitations" of sec-

**17.** Plaintiff argues initially that Defendant's Motion to Dismiss is barred by the law of the case doctrine, inferring that the Court's grant of leave to file the Second Amended Complaint constituted a rejection of any futility argument. The law of the case doctrine applies to questions that are decided "explicitly or by necessary implication." *Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 739 (D.C.Cir.1995).

The law of the case doctrine is clearly inapplicable in the instant case. In granting

Plaintiff leave to file, the Court made no ruling, implicit or explicit, with respect to the merits of his claims. Defendant is certainly not barred from moving for dismissal or summary judgment of those claims at this juncture.

**18.** The rationale in *Brown* has been extended to the ADEA as well. *Thorne v. Cavazos,* 744 F.Supp. 348, 351–52 (D.D.C.1990).

tion 717 by recasting Title VII claims as claims under other statutes and so frustrate the legislative policies underlying Title VII.

The Court of Appeals then applied the rationale of *Brown* to constitutional claims, holding that:

Allowing federal employees to recast their Title VII claims as constitutional claims would clearly threaten those same policies. For that reason, this circuit has repeatedly held that federal employees may not bring suit under the Constitution for employment discrimination that is actionable under Title VII.

*Id.* at 1415; *see also Davis v. Califano,* 613 F.2d 957, 958 n. 1 (D.C.Cir.1979); *Brug v. Nat'l Coalition for the Homeless,* 45 F.Supp.2d 33, 42 (D.D.C.1999).[19]

In the instant case, Plaintiff, in arguing his equal protection claim, relies exclusively on the same evidence underlying his race, gender, and age discrimination claims. He contends, however, that the holdings of *Brown* and *Thorne* are not applicable to this case. As support, Plaintiff first cites to *Hammon v. Barry,* 813 F.2d 412 (D.C.Cir.1987). In *Hammon,* our Court of Appeals overturned an affirmative action plan instituted by the District of Columbia fire department.

Plaintiff's reliance on *Hammon* is totally unavailing for two reasons. First, the plaintiffs were not suing the federal government in *Hammon.* Second, the Court of Appeals never addressed the defense of sovereign immunity.

Plaintiff also relies on *Keller v. Prince George's County,* 827 F.2d 952 (4th Cir. 1987), where the United States Court of Appeals for the Fourth Circuit held that Title VII is not the exclusive remedy for employment discrimination claims against a *state* employer. In reaching that conclusion, the Fourth Circuit considered the rationale in *Brown,* but chose to limit it to the specific holding as applied to federal employees suing the federal government.

Thus, even if Plaintiff's case had been brought in the Fourth Circuit, the only jurisdiction where *Keller* is binding, he would, as a federal employee suing the federal government for discrimination, still fall squarely within the specific holding in *Brown.*[20]

Plaintiff here is a federal employee seeking to bring a constitutional challenge against the federal government premised upon claims of discrimination.[21]

**19.** The Court of Appeals appended an extensive footnote citing similar holdings in this jurisdiction, including, among others, the holdings in *Kizas v. Webster,* 707 F.2d 524, 542 (D.C.Cir.1983); *Lawrence v. Staats,* 665 F.2d 1256, 1257 (D.C.Cir.1981); *Torre v. Barry,* 661 F.2d 1371, 1372 (D.C.Cir.1981); and *Richardson v. Wiley,* 569 F.2d 140, 141 (D.C.Cir.1977).

**20.** Plaintiff also cites to *Byrd v. Ruben,* 1997 U.S. Dist. Lexis 10863 (W.D.La.1997), which he argues is nearly identical to the instant case. In *Byrd,* several Caucasian male employees of the United States Department of Treasury brought an equal protection challenge to the Department's affirmative action program along with discrimination challenges under Title VII. The district court granted the plaintiffs' motion for summary judgment, ruling that the agency had discriminated against them in violation of both Title VII and the Constitution.

Conspicuously, however, the district court never discussed the defense of sovereign im

munity. Nor is there any mention of the application of *Brown.* In short, there is no reason for this Court to follow *Byrd.*

Plaintiff also cites to *Turner v. Browner,* a case from the Northern District of Texas. Plaintiff failed to provide, however, a citation to the case or a copy of the slip opinion as an exhibit. Regardless, the case comes from a district court outside this jurisdiction, and therefore has no binding effect whatsoever on this Court. Given these factors, the Court declines to consider the referenced case.

**21.** The Court is well aware that the Supreme Court's decision in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), changed the legal landscape for considering civil rights challenges. The full scope of that decision, however, is far from clear. No Supreme Court case since *Adarand* has fully explored the implications of that decision.

*Adarand* arose in the context of a government contract plan, rather than a Title VII

The Supreme Court's ruling in *Brown* could not be any clearer in rejecting the type of challenge brought by Plaintiff. Accordingly, Defendant's Motion to Dismiss Second Amended Complaint, or, in the Alternative, for Summary Judgment is granted.[22]

## IV. Conclusion

Plaintiff brought this action alleging race, gender, and age discrimination, as well as retaliation, in violation of Title VII and the ADEA. He further sought to bring a constitutional equal protection challenge to NASA's affirmative action program.

With respect to his race and gender claims, Plaintiff has failed to establish that he is qualified for an upgrade. He is equally unsuccessful in demonstrating either that NASA is the type of unusual employer who discriminates against the majority, or that discrimination was the motivating force behind the denials of his promotion. Plaintiff has therefore failed to establish a prima facie case under Title VII. Accordingly, Plaintiff's race and gender discrimination claims must be **dismissed**.

Plaintiff has also failed to establish a prima facie case of either age discrimination or retaliation. Therefore, those claims must be **dismissed** as well.

Furthermore, case law from the Supreme Court bars Plaintiff's constitutional challenge to Defendant's affirmative action program. Plaintiff's equal protection claim is thus **dismissed**.

In the absence of any material facts in dispute, judgment must be granted as a matter of law. Accordingly, Plaintiff's Motion for Partial Summary Judgment is de-

nied; Defendant's Motion for Summary Judgment is **granted**; and Defendant's Motion to Dismiss Second Amended Complaint, or, in the Alternative, for Summary Judgment is **granted**. Additionally, Plaintiff's Rule 56(f) Motion to compel production of additional employment information is **denied as moot**.

All claims are hereby disposed of.

defenses of standing and exhaustion of administrative remedies raised briefly by Defendant.

Furthermore, the parties have briefed extensively the issue of whether the Equal Opportunity Plan is still in existence. Since the equal protection claim is dismissed, that question is moot as well.

---

claim. While the two share similarities, they also have significant differences, including very different statutory schemes. While the merits of Defendant's Equal Opportunity Plan are not currently before the Court, the effect of *Adarand* on the Plan is undoubtedly an issue requiring greater study.

22. Having disposed of Plaintiff's equal protection claim, the Court need not address the