Shawn BERNSTEIN

v.

THE ST. PAUL COMPANIES, INC.

No. CIV. L–99–3056.

United States District Court,
D. Maryland.

March 15, 2001.

John M. Clifford, Clifford Lyons and Garde, Mona Lyons, Clifford, Lyons & Grade, Washington, DC, for Plaintiffs.

Kathryn A. Mrkonich, Littler, Mendelson, P.C., Minneapolis, MN, Angela R. Brown, Law Office, Baltimore, MD, Andrew J. Voss, Littler Mendelson, P.C., Marko J. Mrkonich, Law Office, Minneapolis, MN, Thomas P. Dowd, Littler Mendelson PC, Washington, DC, for Defendants.

## MEMORANDUM OPINION

LEGG, District Judge.

This is an employment discrimination case. Now pending is defendant's motion for summary judgment. Because the motion has been fully briefed, no hearing is necessary. *See* Local Rule 105.6. For the reasons stated herein, the Court, by separate order, will enter summary judgment in favor of the defendants as to all claims except for the claim of retaliation.

### *I. Summary*

Because the case is complex, an overview is in order. In 1998, St. Paul, an insurance company headquartered in Minnesota, acquired USF & G Corporation, an insurance company headquartered in Baltimore. One of the business reasons for the acquisition, technically a merger, was the saving of overhead costs by the elimination of redundant jobs.

Before the merger, plaintiff Shawn Bernstein worked in the USF & G legal department. Bernstein spent half his time on insurance coverage issues, and the other half on governmental affairs. A common thread ran through Bernstein's performance evaluations: high marks for his intellect and ability to analyze legal questions, but concerns over his interpersonal skills. Bernstein's superiors commented that he tended to be introverted, diffident

in large groups, and was sometimes demeaning to those less intelligent.

Bernstein's position with USF & G was eliminated. This did not mean, however, that he was automatically out of a job. Under reduction-in-staff procedures, incumbents were required to compete for their positions. Bernstein was given the opportunity to compete for the position of federal affairs representative against the St. Paul incumbent, Tracey Burton. Burton had become federal affairs representative for St. Paul several months before the merger. St. Paul's chief executive officer, Doug Leatherdale, reported that he was "extremely pleased with the job that [she] was doing." Mot. Ex. 9 at 34.

After the merger, Karen Himle, to whom the federal affairs representative would report, compared Burton and Bernstein as candidates. Himle interviewed Bernstein and also spoke with Bernstein's supervisors at USF & G. Each supervisor recommended against giving Bernstein the federal affairs job, based in large part on their perceptions of him as an introvert, with excellent research skills but weaker interpersonal skills. The views of the supervisors confirmed Himle's own perspective on Bernstein.

Before the competition, Burton had reported to Himle for several months. Himle thought that Burton had done a good job; she was also aware of the CEO's satisfaction with Burton's performance.

Himle decided to retain Burton and terminate Bernstein.

After exhausting his administrative remedies, Bernstein filed the instant suit.[1] Bernstein contends that his objective qualifications (legal ability, knowledge of insurance law, and lobbying experience) were superior to Burton's. Bernstein claims that St. Paul preferred Burton for the job because she was a younger (then under age 40), African–American female, whereas he was an older (mid–50s), white male with a disability resulting from polio. Bernstein points to a speech in which St. Paul's CEO stated that (i) he did not want the company to consist exclusively of white men, and (ii) that he would base part of his managers' bonuses on their success in supporting "diversity."

The Court must analyze each of Bernstein's claims under the familiar *McDonnell Douglas* framework.[2] Because the federal affairs position would have represented a promotion (with a $30,000 raise), Bernstein must establish a prima facie case by showing: (i) that he was a member of a protected class, (ii) that St. Paul had an open position for which he applied, (iii) that he was qualified for the position, and (iv) that he was rejected under circumstances giving rise to an inference of unlawful discrimination. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959–60 (4th Cir.1996).

1. Bernstein's complaint states causes of action for reverse race and reverse gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., reverse race discrimination under 42 U.S.C. § 1981, age discrimination under the Age Discrimination in Employment Act [ADEA], 29 U.S.C. § 623(a)(1), discrimination on the basis of disability under the Americans with Disabilities Act [ADA], 42 U.S.C.A. § 12101 et seq., retaliation under Title VII, § 1981, the ADEA, and the ADA, and wrongful discharge under Maryland common law or under Maryland's Fair Employment Practices Act [FEPA].

2. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 278 (4th Cir.2000) (§ 1981); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995) (ADA); *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1314 (4th Cir.1993) (ADEA).

Bernstein meets the first three parts of the test, but cannot meet the fourth. Assuming arguendo that Bernstein could establish a prima facie case, St. Paul must proffer a legitimate, nondiscriminatory reason for preferring Burton. St. Paul has met this burden by proffering that Burton, given her superior interpersonal skills and her satisfactory performance as the incumbent, was a stronger candidate.

Thus, Bernstein must come forward with sufficient evidence from which a reasonably minded jury could conclude that St. Paul's stated reason for preferring Burton was "just a pretext for discrimination." *Evans,* 80 F.3d at 959. Bernstein has failed to meet this burden. It is uncontroverted that the legal affairs position needed someone with considerable interpersonal skills, and that Bernstein had been consistently marked down in that area. His direct superior at USF & G, Jack Andryszak, testified that Bernstein was "not particularly interactive," and was a "bit introverted." Mot. Ex. 4 at 16. Andryszak also stated that he sometimes had to "encourage [Bernstein] quite a bit" to give public presentations and perform other social aspects of his job. *Id.*

Bernstein's superiors at USF & G, including men who had promoted him and given him favorable job ratings, all recommended against giving Bernstein the federal governmental affairs job. Bernstein cannot point to a single comment by the decision-maker, Karen Himle, suggesting that she took race, sex, age, or handicap into account. Himle denies that she did. Bernstein rates his qualifications as superior to Burton's, but his self-assessment cannot establish pretext.[3] St. Paul's commitment to "diversity" does not by itself raise an inference that the company had a policy of illegal discrimination.

In sum, the record shows that there were two candidates for the job. Bernstein had a stronger background in insurance law and lobbying. Burton had better interpersonal skills and had performed well in the job for which the competition was being held. St. Paul, through Karen Himle, chose Burton's combination of skills over Bernstein's. The company is permitted to choose one candidate over the other for any reason that is not predicated upon an impermissible factor. The discrimination laws do not permit this Court "to sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted).

Apart from speculation and suspicion, Bernstein has produced no evidence from which a jury could find that the company preferred Burton based on her race, gender, age, or absence of disability. Accordingly, his claims of discriminatory failure to promote cannot withstand summary judgment.

Bernstein's complaint also claims that St. Paul retaliated against him in two ways for having filed a claim of discrimination. First, he claims that St. Paul should have let him work through April 13, 1999. The company paid his full salary through that date, but he did not receive full medical benefits after his termination date, January 11, 1999. Because St. Paul told Bernstein over six months before that his employment would end in December 1998, he

---

**3.** The Fourth Circuit held in *Lowery v. Circuit City Stores, Inc.* that "[t]he mere assertion [by the plaintiff] that [the plaintiff] was more qualified is insufficient to establish pretext." 158 F.3d 742, 763 (4th Cir.1998), *vacated on* *other grounds,* 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999). *Accord Vaughan v. Metrahealth Cos., Inc.,* 145 F.3d 197, 202 (4th Cir.1998).

cannot base a retaliation claim on this decision by the company.

Bernstein's second claim of retaliation does survive summary judgment, however. In May 1998, St. Paul told Bernstein that his severance package would include two weeks' pay for each year of service. Opp'n Exs. 25–26. Bernstein later filed a claim of discrimination with the EEOC. Thereafter, the company informed Bernstein that he would still receive his entire severance package as promised, but only if he withdrew his filed claim and released St. Paul from any other claims. Bernstein refused to comply with this request, and the company refused to pay him the entire severance package. A company may condition an additional payment on the release of a filed claim, or require a waiver of future claims in exchange for a severance package. *Hansen v. Vanderbilt Univ.,* 961 F.Supp. 1149, 1153 (M.D.Tenn.1997); *Cronin v. ITT Corp.,* 737 F.Supp. 224 (S.D.N.Y.1990). St. Paul, however, withheld benefits it had already promised, requiring the withdrawal of a filed claim. A reasonably minded jury could conclude that St. Paul retaliated against Bernstein.

## II. Background

Shawn Bernstein, a white man, was born in 1944. As a result of polio, he has a weakened left arm and a withered right arm. He holds a 1966 B.A. in government from American University, a 1982 Ph.D. in political science from Columbia University, and a 1988 J.D. from Columbia University School of Law. Opp'n Ex. 8. During his graduate studies Bernstein worked in Washington, D.C. for the Committee for Economic Development and as a guest scholar at the Brookings Institution. After graduating from Columbia Law, Bernstein worked for four years as a litigation associate at Covington and Burling, where he had assignments in insurance, antitrust, securities, banking regulation, and constitutional law.

In 1992, Bernstein joined the legal department at USF & G with the title of Counsel. Two years later he was promoted to Senior Counsel. Immediately before the merger, Bernstein was assigned to spend half his time on insurance coverage and half on federal governmental affairs. During his tenure at USF & G, Bernstein reported directly to Jack Andryszak. Bernstein reported indirectly to Jay Huber, Deputy General Counsel, and John MacColl, USF & G's General Counsel.

Bernstein's performance reviews at USF & G were mixed. In a consistent theme that runs through his written evaluations, Bernstein received high marks for intelligence and diligence, but was regularly marked down for temperament. In 1994, Bernstein's supervisor advised him to "try to overcome his diffidence in large groups." Opp'n Ex. 9. Bernstein's 1996 evaluation praises his intellectual ability, but notes deficiencies, including reports that were "sometimes too detailed and esoteric," the need to "spend even more time with his ... clients," the need to "better assess the business needs of his audience," the need to avoid being "ponderous," and a level of "intensity [that] can cause him to be resentful and manipulative of the system and of his colleagues in the Legal Department." Opp'n Ex. 14.

Bernstein's 1997 evaluation compliments his thorough, intelligent approach to intellectual issues, but cites temperament problems, including the comment that "sometimes, Shawn's discussions with clients are unintentionally demeaning." Mot. Ex. 3. In deposition testimony, Andryszak, Bernstein's primary supervisor, stated that "[h]e is a bit introverted ... he would do anything I directed him to do but sometimes you had to encourage him quite a bit to do that," and that "Shawn was a great notetaker and he was a great report writ-

er. He was not particularly interactive." Mot. Ex. 4 at 16.

Tracey Burton, an African–American woman, was born in 1962. She received a J.D. from the University of Iowa Law School in 1988. For six years she worked in the employment and licensing divisions of the Minnesota Attorney General's Office. She also worked as a civil rights policy director for Hubert Humphrey, the Minnesota Attorney General. After joining St. Paul in 1994, Burton was promoted steadily, advancing from Corporate Counsel, to Senior Corporate Counsel, and to Assistant Vice President for Government Affairs. Mot. Ex. 6 at 4–11. At least several months before the merger, Burton took on full-time federal affairs responsibilities. St. Paul's chief executive officer was "extremely pleased with the job that [she] was doing." Mot. Ex. 9 at 34.

In its papers, St. Paul overstates Tracey Burton's lobbying and insurance coverage background. It is apparent that before her promotion to Assistant Vice President for Government Affairs, the bulk of Burton's experience was in the area of civil rights policy and the handling of discrimination claims.

Some at St. Paul thought Burton was inexperienced. Jack Andryszak admits telling Bernstein that Burton was "not the brightest bulb on the tree," and says that he was "probably commiserating with Shawn." Opp'n Ex. 30B at 65. He also thought she was "quiet," "arrogant," and "a lightweight." Opp'n Ex. 30B at 65, 71, 75–76, 86–87. Finally, Andryszak thought that Burton received the job in question because she was a woman, but not because of her race. Opp'n Ex. 30B at 80–81. Andryszak believed Burton's gender con-

tributed to the decision because Leatherdale's two most recent personal assistants had also been women. *Id.* Karl Aaro, to whom Burton reported immediately before the merger, found her "a little secretive" and "aloof" at "moments," but summed up her interpersonal skills as "terrific." Mot. Ex. 11 at 49–50.

In January 1998, USF & G and St. Paul announced their merger. One contemplated economy of scale was a reduction in overhead through the elimination of redundant jobs. Redundant employees were expected to compete for their positions.[4] When jobs were not exact duplicates of each other, employees could compete for the jobs for which they were reasonably eligible.

Before the merger, Karen Himle worked for St. Paul in government affairs and corporate communications. After the merger she became Senior Vice President for Corporate Affairs. Also after the merger, management decided that (i) the federal affairs representative of the combined company would report to her; (ii) Burton and Bernstein would compete as candidates for the federal affairs job in the new organization; and (iii) Himle would make the hiring decision. Mot. Ex. 7 at 55–56; Opp'n Ex. 3. For Bernstein, who had been a part-time lobbyist at USF & G, the job represented a promotion. Burton was the incumbent.

On March 5, 1998, Himle interviewed Bernstein. Himle also spoke with Bernstein's supervisors at USF & G, Jack Andryszak, John MacColl, and Jay Huber. Mot. Ex. 7 at 59. All three supervisors recommended against giving Bernstein the federal affairs job. These supervisors'

---

4. A staffing procedure dated April 1, 1998 required the USF & G and St. Paul incumbents to compete for their jobs in the new organization. Opp'n Ex. 5. According to Leatherdale, this process applied to all posi-

tions after the merger. Opp'n Ex. 30G at 47–48, 51–52. On April 16, 1998, Himle wrote that she considered both Burton and Bernstein for the federal affairs job and preferred Burton.

recommendations were based primarily on their perceptions of him as an introvert, with excellent research skills but weaker interpersonal skills. These assessments jibed with Himle's own view of Bernstein. Mot. Ex. 7 at 64.

Himle also considered Burton for the job. Burton had reported to Himle for several months, before the merger, and Himle was satisfied with Burton's performance. Mot. Ex. 7 at 34–35, 37–39. Himle also knew that St. Paul's CEO, Doug Leatherdale, was impressed with Burton. Mot. Ex. 7 at 46, 48.

The federal affairs position required knowledge of insurance law, knowledge of the government, and polished social skills. Himle chose Burton as the stronger candidate. In deposition, Himle specifically denied that race, sex, disability, or age played any role in her decision. Himle testified that she chose Burton because (a) Burton had been doing a good job as the incumbent; (b) Leatherdale was satisfied with Burton's performance; and (c) Bernstein's supervisors at USF & G had recommended against him. Mot. Ex. 7 at 34–35, 37–39, 46–48, 59, 64.

St. Paul, like most major companies, has an official corporate commitment to "diversity." In 1998, CEO Leatherdale gave a speech to USF & G employees in which he outlined St. Paul's diversity policy and said that he did not want the company to consist exclusively of white men. Opp'n Ex. 23. Leatherdale testified that such a company would "not be consistent with my other objectives of building a more diverse group of people and some tolerance and understanding of diversity." Opp'n Ex. 30G at 44. He also emphasized that "what I want to see in the senior management of this company are the most talented people that are available .... irrespective of whether they are of a certain gender or of a certain race." Opp'n Ex. 30G at 45. Part of managers' bonuses at St. Paul are based on their success in supporting diversity by creating and promoting a respectful environment. Opp'n Ex. 19 at 2, Ex. 20 at 2.

There is no evidence, however, of a connection between the diversity policy and Himle's decision to retain Burton rather than Bernstein. St. Paul has no quotas or specific numerical goals for hiring and promoting minorities. Mot. Ex. 10 at 15; see also Opp'n Ex. 17. Himle testified that she felt no pressure to hire Burton because of Burton's race or sex. Mot. Ex. 7 at 12–15. Himle's personal bonus was not affected by her decision to hire Burton or other minorities. Mot. Ex. 7 at 23. As written, and understood by Himle, the policy was not an affirmative action plan, but was aimed at ensuring that the work environment was supportive and respectful of all employees. Mot. Ex. 7 at 12, 16.

On March 23, 1998, Huber told Bernstein that (i) he would not receive an ongoing position after the merger, and (ii) his current position would end at the end of 1998. Mot. Ex. 3 at 12. In a May 1, 1998 memo to Bernstein, Huber confirmed that his termination date would be December 31, 1998. As to compensation, Huber confirmed that Bernstein would receive a severance package including two weeks' pay for each year of service, that he would continue to be covered by USF & G health, pension, and 401K plans, and that he would receive a performance bonus of 15% of his base salary if he stayed at the company through December 1998. Opp'n Exs. 25–26.

Bernstein contends that in November 1998, he told Andryszak that he would work through December 31, 1998, and cash in his accrued but unused vacation days. Mot. Ex. 3 at 286. On December 22, 1998, Bernstein advised Andryszak that he had filed a discrimination charge against the company. Mot. Ex. 3 at 306. On Decem-

ber 30, 1998, Bernstein e-mailed Andryszak to tell him that he believed that he had not yet received a formal, written notice of termination from St. Paul, and that he intended to continue to work until he received one. Mot. Ex. 3 at 312–13. On January 6, 1999, Bernstein filed a formal EEOC charge of discrimination against St. Paul.

Bernstein received a formal notice of termination dated January 11, 1999.[5] Opp'n Ex. 27. St. Paul's termination arrangement provided that Bernstein would:

- work through January 11, 1999.
- receive pay for his accrued and unused vacation.[6]
- be paid, in lieu of ninety days' notice, through April 13, 1999.
- be ineligible for St. Paul's employee benefits after January 11, 1999.
- receive COBRA benefits after January 11, 1999.[7]
- receive severance pay (two weeks' pay per year served) if he signed a waiver.
- receive career planning services if he signed a waiver.

Mot. Ex. 3 at 286–89; Opp'n Exs. 27–29. The last two benefits were "contingent upon execution of a waiver and release," to be "outlined in a formal separation agreement, which will be forwarded to you prior to or shortly after your termination date." Opp'n Ex. 27. The waiver required him to abandon his filed claim against St. Paul, Opp'n Ex. 2 at 9, and Bernstein did not sign the waiver.

The human resources department handled the timing of Bernstein's termination and other severance-related details. Mot. Ex. 7 at 113. Bernstein does not know if other employees' severance packages were conditioned on the signing of waivers or release agreements. Mot. Ex. 3 at 324–25. He says he has heard of two other employees who were allowed to work, and thus to retain benefits, through the notice period.[8] Mot. Ex. 3 at 322–23. In a letter to Bernstein on February 4, 1999, Celeste Coleman, a human resources manager at St. Paul, told him that his termination "was in accordance with St. Paul's Severance Plan and consistent with St. Paul's practices relative to other employees." Opp'n Ex. 29.

Summary judgment is proper if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must draw all reasonable factual inferences in favor of the non-movant. 477 U.S. at 255, 106 S.Ct. 2505. Where there is a complete failure of proof on one of the elements of the cause of action, all other material questions of fact become immaterial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "But, especially in an employment discrimination case, where the employer's state of mind and motive are often critical determinations, a court must find that it is

---

**5.** Although a letter written by Bernstein suggests that the initial notice was revised and replaced by a different version, Opp'n Ex. 28, the record contains only one formal notice of termination. Opp'n Ex. 27.

**6.** Bernstein acknowledges that the amount of pay and vacation pay he ultimately received was higher than the amount that he had ex-

pected to receive as of November 6, 1998. Mot. Ex. 3 at 292.

**7.** COBRA benefits are federally mandated health benefits for employees in transition.

**8.** Bernstein submits no independent evidence supporting this claim.

perfectly clear that there are no genuine issues of material fact before granting summary judgment." *Harmer v. Virginia Elec. and Power Co.,* 831 F.Supp. 1300, 1305 (E.D.Va.1993), *quoting Ballinger v. North Carolina Agric. Extension Serv.,* 815 F.2d 1001, 1004–05 (4th Cir.1987).

### III. Failure to Promote

Bernstein's Title VII, § 1981, ADA, and ADEA claims are all analyzed under the *McDonnell Douglas* framework.[9] As an initial matter, the parties skirmish about whether Bernstein claims a discriminatory failure to hire, a discriminatory termination, or a discriminatory failure to promote.[10] The Court concludes that Bernstein's claim must be analyzed as a failure to promote. The federal affairs position would have represented a promotion for Bernstein. In comparison with his old job at USF & G, the new position (i) paid considerably ($30,000) more, (ii) was a full time governmental affairs job,[11] and (iii) reported directly to senior management.

■ To establish a prima facie case for discriminatory failure to promote, Bernstein must show: that he was a member of a protected class, that the employer had an open position for which he applied or sought to apply, that he was qualified for the position, and that he was rejected under circumstances giving rise to an inference of unlawful discrimination. *Evans,* 80 F.3d at 959–60. If a plaintiff establishes a prima facie case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for failing to promote him. If the

defendant does so, then the plaintiff must shoulder the ultimate burden of proving that the defendant's stated reason is "just a pretext for discrimination." *Evans,* 80 F.3d at 959.

In this case, Bernstein falls short for two reasons. First, he has failed to show sufficiently suspicious circumstances to give rise to an inference of discrimination. Second, assuming *arguendo* that Bernstein could establish a prima facie case, St. Paul has advanced legitimate, nondiscriminatory reasons for choosing Burton: Bernstein's weaker interpersonal skills and St. Paul's satisfaction with Burton's job performance. Bernstein has failed to produce sufficient evidence to permit a reasonably minded jury to reject these reasons as pretextual.

■ Bernstein argues that the following facts demonstrate that Burton was selected on account of her race, age, sex, and absence of disability: (i) Bernstein denies that he lacked interpersonal skills, (ii) Bernstein contends that his background in insurance law and governmental affairs was stronger than Burton's, (iii) he considers himself better qualified for the job than Burton, (iv) other employees made negative statements about Burton's inexperience, temperament, and lack of qualifications, (v) Leatherdale stated that he did not want the company to consist exclusively of white men, and (vi) St. Paul's bonus plan bases part of some managers' bonuses on their success in supporting "diversity."

None of these arguments holds up under close scrutiny. As an initial proposition,

---

9. *See supra* note 2.

10. Bernstein argues that his claim is a "hybrid" of failure to hire and wrongful termination claims, and St. Paul argues that it is a claim of failure to promote. With respect to termination, the position Bernstein had held before the merger did not exist after the merger.

11. In deposition, Bernstein described his interview with Himle as "interviewing for the job I had at USF & G." Mot. Ex. 3 at 40. The record does not support Bernstein on this point, however.

Bernstein has no evidence that anyone other than Karen Himle made the ultimate decision to retain Burton rather than promote him. While Himle considered the views of Leatherdale and Bernstein's USF & G supervisors, she testified without contradiction that the decision was hers to make and that she made it.

■■■■■ Bernstein has no direct evidence that Himle's decision was based on an impermissible factor. Bernstein can point to no statement by Himle suggesting that she is biased against middle aged white males or persons with disabilities, or that she chose Burton because of Burton's race or gender. There is likewise no evidence of any discriminatory hiring or promotion pattern by Himle or St. Paul. While the company has a diversity policy and a diversity officer, there is no evidence of a quota system or numerical goals.[12] Both Himle and St. Paul denied that her bonus (or other compensation) was affected by her decision to hire or retain Burton in specific or women and African Americans in general.

While Bernstein denies that his interpersonal skills were weak and considers himself better qualified than Burton, his own personal assessment is irrelevant. An employee's personal view that he is qualified for a position or better qualified than another candidate is, under Fourth Circuit law, irrelevant and insufficient to establish pretext.[13]

Bernstein alleges that other employees made negative comments about Burton, criticizing her experience, temperament, and qualifications. These negative comments about Burton are insufficient to establish pretext. In general, random gripes about an employee are of little probative value. It is a rare employee, particularly in senior management at a large company, who satisfies everyone or who has no enemies. The comments offered by Bernstein add little to the case. Bernstein heard most of them at second hand. The only non-hearsay comments were made by Karl Aaro and Jack Andryszak.[14]

Karl Aaro, to whom Burton reported immediately before the merger, found her "a little secretive" and "aloof" at "moments," but concluded that her interpersonal skills on the whole were "terrific." Mot. Ex. 11 at 49–50.

During discovery, Andryszak, who has since left St. Paul, admitted telling Bernstein that Burton was "not the brightest bulb on the tree," "quiet," "arrogant," and "a lightweight." Opp'n Ex. 30B at 65, 71, 75–76, 86–87. Finally, he thought that she received the job in question because she was a woman, but not because of her race. Opp'n Ex. 30B at 80–81. He believed her gender contributed to the decision because Leatherdale's two most recent personal assistants had been women. *Id.* Despite this, Andryszak also testified that (i) his surmise about Leatherdale's motivation is mere conjecture, (ii) that Burton was positively viewed by members of a law firm that had long been associated with St. Paul, Mot. Ex. 30B at 75, (iii) that some of his comments had been made in commiser-

---

**12.** A company's (or its CEO's) commitment to "diversity," if expressed in terms of creating opportunities for employees of different races and both genders, or fostering workplace tolerance, is not proof of discriminatory motive with respect to any specific hiring decision. *See, e.g., Lutes v. Goldin*, 62 F.Supp.2d 118, 128 (D.D.C.1999). Indeed, it would be difficult to find today a company of any size that does not have a diversity policy.

**13.** *See supra* n. 3.

**14.** Moreover, the negative comments about Burton must be balanced against (i) positive statements made by Leatherdale, Himle, Aaro, and others about Burton's good performance, and (ii) a consistent strain of written negative comments about Bernstein's poor social skills.

ating with Bernstein after Bernstein had learned he would not get a job, and (iv) that despite his views on Burton he recommended that Himle not give the governmental affairs post to Bernstein.

It is this last point that makes Bernstein's claim of discrimination untenable. All three of Bernstein's USF & G supervisors (Andryszak, Huber, and MacColl) determined that Bernstein was not a good choice for the governmental affairs post and so advised Himle. These are not men predisposed to discriminate against Bernstein. They hired Bernstein at USF & G; they promoted him from Counsel to Senior Counsel; they recommended him for raises; they gave him good work assignments; they stated, in their evaluations and otherwise, that they liked Bernstein personally, and that he had strong legal skills.[15]

All three supervisors, however, downgraded Bernstein's interpersonal skills, and their assessments are fully supported by contemporaneous written evaluations. Because strong social skills are an obvious requisite for a governmental relations job, they advised Himle not to give the job to Bernstein. An employer is permitted to chose one candidate over another for any reason that is not predicated on an impermissible factor. In order to prevail, Bernstein is required to produce evidence from which a reasonably minded jury could conclude that St. Paul chose Burton based on race, sex, age, or disability. Bernstein has

produced no such evidence.[16] Accordingly, summary judgment will be entered in favor of St. Paul on this claim.

### IV. Retaliation

■ In order to establish a prima facie case of retaliatory termination, Bernstein must prove "(1) that [he] engaged in protected activity; (2) that the employer took adverse employment action against [him]; and (3) [that] a causal connection existed between the protected activity and the adverse action." *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). Bernstein filed his EEOC charge on January 6, 1999. He received his severance package five days later, on January 11, 1999. Bernstein argues that St. Paul retaliated against him in two ways: (1) by paying him in lieu of notice from January to April 1999, rather than allowing him to work during this period (and therefore denying him full health benefits); and (2) by conditioning part of his severance package on the withdrawal of his EEOC claim.

■ St. Paul's decision not to allow Bernstein to work from January 11, 1999, to April 13, 1999, meant that Bernstein did not retain company benefits, but only COBRA benefits, for that period. Bernstein's claim on this basis cannot withstand scrutiny. The company told him months before

---

**15.** "[W]here the same person does the hiring and firing of an individual, an inference arises that the firing did not result from an improper discriminatory motive." *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 745 (7th Cir.1999); *see also Proud v. Stone*, 945 F.2d 796, 798 (4th Cir.1991). On the facts of this case, this "same-actor inference" applies well to Bernstein's supervisors' unanimous decision not to recommend him for the position.

**16.** Had Burton been terminated, her hypothetical discrimination case, on paper, would have been far stronger than Bernstein's.

Burton could have argued that (i) she was a member of two protected classes, (ii) there was an open position, (iii) she was performing satisfactorily as the incumbent, and was, therefore, qualified for the position, (iv) Bernstein's USF & G supervisors all recommended against giving Bernstein the federal affairs post, (v) the upper management of St. Paul are primarily middle-aged white men, (vi) the company has a policy of promoting a tolerant workplace, including tolerance to older workers with disabilities, and (vi) she was rejected in favor of an older worker with a handicap.

he filed an EEOC charge that he would only be employed at St. Paul through December 31, 1998. He had no reason to expect to work as usual through mid-April.[17] Bernstein offers no proof that he was treated differently from any other employee. He had no reason to expect to receive full employee benefits (rather than COBRA benefits) through this period, and cannot bring a retaliation claim based on the loss of these benefits.

■ Bernstein's other claim of retaliation does survive summary judgment. St. Paul, through Huber, told Bernstein in writing to expect a severance payment including two weeks' pay for every year served. Bernstein then filed an EEOC charge of discrimination against the company. Later, the company told him that he could only have the severance package if he withdrew the charge. A company may offer additional payment in exchange for withdrawal of a filed EEOC claim. *Hansen,* 961 F.Supp. at 1153; *Cronin,* 737 F.Supp. at 231 (emphasizing that the award conditioned on withdrawal of a charge was "separate and apart from the severance pay to which he was entitled, and that [plaintiff] was paid his full severance pay"). St. Paul offered no additional payment. A reasonable juror could find that St. Paul punished Bernstein for filing his claim by withholding severance pay.[18] With respect to severance pay, Bernstein's retaliation claim shall survive summary judgment and proceed to trial.

### V. *Wrongful Discharge*

Bernstein does not oppose summary judgment on this count. Opp'n at 47.

### VI. *Conclusion*

For these reasons, the Court will deny summary judgment on Bernstein's retaliation claim (Count VI), and will grant it to St. Paul on all other counts (Counts I–V and VII).

### ORDER

In accordance with the attached Memorandum, it is this 15th day of March, 2001, by the United States District Court for the District of Maryland, ORDERED:

1. That Defendant's Motion for Summary Judgment is hereby GRANTED as to counts I, II, III, IV, V, and VII; and

2. That Defendant's Motion for Summary Judgment is hereby DENIED as to count VI.

---

17. St. Paul's apparent decision to accept his view that he had not yet received formal notice of termination, and to pay him through April 13, 1999, is irrelevant.

18. A letter from St. Paul's human resources officer to Bernstein, telling him that his "termination was in accordance with St. Paul's Severance Plan and consistent with St. Paul's practices relative to other employees," does not suffice to establish a legitimate nondiscriminatory reason for St. Paul's action. Opp'n Ex. 29. The record lacks evidence to support the assertion in the letter.